**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-223 (APM)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Matthew Mark Wood** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO TRANSFER VENUE AND**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

COMES NOW, Defendant, Wood, by undersigned counsel, and respectfully moves the

Court, pursuant to Federal Rule of Criminal Procedure 21, for a transfer of venue so that he may be

tried by an impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States

Constitution.

### I.    PROCEDURAL HISTORY

These cases arise out of the events at the United States Capitol on January 6,

2021(hereinafter "J6").  Defendant Wood was indicted on March 17, 2021 with a six count

indictment charging violations of 18 U.S.C. Sections 1512(c)2 and 2 (Obstruction of an

Official Proceeding and Aiding and Abetting), 18 U.S.C. Section 1752(a)(1) (Entering and

Remaining in a Restricted Building or Grounds), 18 U.S.C. Section 1752 (a)(2) (Disorderly

and Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. Section

5104(e)(2)(C) (Entering and Remaining in Certain Rooms in the Capitol Building), 40

U.S.C. Section 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) and 40 U.S.C.

Section 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).  ECF, Doc. 8.

## II.   LEGAL ARGUMENT
### A. Federal Rule of Criminal Procedure 21(a)

The Fifth and Sixth Amendment of the United States Constitution entitle criminal defendants to a fair trial by an impartial jury. *See In re Murchison*, 349 U.S. 133, 136 (1955).  "The theory in our system of law is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence[.]"*Patterson v. Colorado*, 205 U.S. 454, 462 (1907).  Justice Hugo Black observed that the American justice system "has always endeavored to prevent even the probability of unfairness." *Id.*  Accordingly, Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair)(*see also Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during voir dire] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory.").  "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966).

When the threatened harm is prejudice to a fair trial, a number of alternatives less

restrictive of expression may be available, which include:

> (a)change of trial venue to a place less exposed to intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court(;) (e) sequestration of jurors (to) enhance the likelihood of dissipating the impact of pretrial publicity and emphasize the elements of the jurors' oaths.

*In re Halkin*, 598 F.2d 176, 195, (D.C. Cir. 1979) (*citing Nebraska Press Ass'n*, 427 U.S. at 563-

64; s*ee also Sheppard,* 384 U.S. at 333).  In *Irving v. Dowd*, the Supreme Court stated:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.

> *Irvin v. Dowd,* 366 U.S. 717, 722 (1961); but see *Patton v. Yount*, 467 U.S. 1025, 1031-

1032 (1984) (distinguishing *Irvin v. Dowd's* holding on the grounds that the second jury trial

took place four years later after pretrial publicity had long subsided.)

The Court further recognized that the presumption of prejudice overrides juror

declarations of impartiality during voir dire because such attestations may be insufficient to

protect a defendant's rights in particularly charged cases.  Where pervasive pretrial publicity has

"inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a

defendant cannot possibly receive an impartial trial," the district court must presume local

prejudice and transfer the proceeding. *United States v. QuilesOlivo*, 684 F.3d 177, 182 (1st Cir.

2012); *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429-430 (1991) (*citing Patton*, *supra*, at 1035

("Under the constitutional standard, on the other hand, 'the relevant question is not whether the

community remembered the case, but whether the jurors . . . had such fixed opinions that they

could not judge impartially the guilt of the defendant.'").

When examining a Rule 21 motion to transfer venue, a court should consider (1) the size

and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the

proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010). In *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally. *Id*. The Court in *Skilling* distinguished the facts before it from the "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." *Skilling v. United States*, 561 U.S. 358, 381-382, 130 S. Ct. 2896, 2915, 177 L. Ed. 2d 619, 643, (2010).

A review of the *Skilling* factors makes apparent that the Court should transfer the Defendant's case from the District of Columbia. Respectfully, the Defendant's request that his case be transferred 8 miles to the United States District Court for the Eastern District of Virginia located in Alexandria. By so doing, the Defendant stands a significantly better chance of being tried before a truly impartial jury.

## B. Size and Characteristics of the Community

The first *Skilling* factor to consider is the size of the population eligible for jury duty. *Skilling*, 561 U.S. at 382 (comparing Houston's 4.5 million potential jury pool with a smaller Louisiana parish with 150,000 residents). The District of Columbia has less than 700,000 in total population[1], but because of its more transient population, the potential jury pool is likely much smaller than a comparable federal district.[2, 3]

---

[1] This total is not broken down to those eligible for jury duty.
[2] See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545) https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripledcompared-previous-decade
[3] See US Census, Quick Facts - District of Columbia, https://www.census.gov/quickfacts/DC (last visited March 28, 2022)

Several January 6th Defendants, not Mr. Wood, commissioned a Multi-District Survey.  *See* Exhibit A.   ("Ex. A" or  "Multi-District Study").  This extensive survey was conducted in four regions: the District of Columbia, the Middle District of Florida (Ocala Division), the Eastern District of North Carolina, and the Eastern District of Virginia. (*Id*. at p.1, f.n. 2).   While the non-D.C. test areas registered remarkably similar results to each other, the survey found that D.C. respondents were an outlier and had a "decidedly negative" towards J6 defendants. (*Id*. at 2).

Shockingly, "*91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%.*"  *Id*.  A whopping 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area.  *Id*.



A significant finding in the survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of J6.   Respondents were asked:  Have you experienced increased concern about your own safety or the safety of people important to you due to the Events of January 6th?  The difference between the D.C. and the other areas is astounding:



The survey included four questions as to the personal impact J6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia.  (Exh. A at 4).

As the Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four months after the J6.  Mayor Bowser declared a state of emergency and implemented a 6 p.m. curfew for weeks subsequent to J6.  The District implemented significant road and public space closures in direct response to J6.[4] The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists who were allegedly emboldened by the "mob assault" on the Capitol.[5]  Additionally, nearly 15,000 individuals work for Congress directly, and many more D.C. residents have friends and family who work on The

---

[4] DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosures-threatsnational-mall/2542719/ (last visited March 28, 2022).
[5] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent domestic-extremists (last visited March 28, 2022).

Hill.[6]  Finally, many D.C. residents have friends and family employed by law enforcement

groups who took part in responding to J6. [7]

      The majority of potential jurors in the District of Columbia were personally impacted in

some way by the events on Capitol Hill on J6.  (Exh. A at 4).  This factor weighs heavily in favor

of transferring the instant cases to the Eastern District of Virginia.  D.C. is a city that, as a whole,

feels that it has been the victim of a crime.  J6 was a substantially more impactful event than

Enron's collapse, which personally affected a few hundred families in city of 4.5 million

residents, who could easily be stricken from the jury pool.

### C. Nature and Extent of Pretrial Publicity

      The next *Skilling* factor pertained to the adverse publicity against the former Enron

executive.  *Skilling*, 561 U.S. at 382 ("Second, although news stories about Skilling were not kind,

they contained no confession or other blatantly prejudicial information of the type readers or

viewers could not reasonably be expected to shut from sight.).  The nature and extent of pretrial

publicity related to the events of J6 weigh heavily in favor of transferring venue.  District residents

have been exposed to thousands of comments from local and national leaders regarding J6, related

arrests, criminal charges and, more recently, prosecutorial outcomes.   Unlike the Enron

prosecution, J6 is an ongoing event, with prosecutors still continuing to charge defendants.  The

negative publicity loop never stops, whereas in *Skilling*, four years went by before the trial took

place, with little negative publicity.

      Negative press coverage is guaranteed to continue for a long time.  Congress's

---

[6] Vital Statistics on Congress, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.
[7] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. Human Capital Strategic Plan 2021-2025,U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf.  4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. See Metropolitan Police Force Annual Report 2020, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowr es_a.pdf

Select Committee has released a number of public statements about alleged "insurrectionists," "white supremacists," and "domestic terrorists."[8] Speaker Pelosi went so far as to declare that Donald Trump was an accessory to murder.[9] (See Section 3 below for additional citations). Respectfully, the Defendant does not agree that J6 was an "act of domestic terror," "a white supremacist attack," or an "insurrection." In fact, unlike D.C. residents, most Americans, as the three attached surveys show, believe that J6 was a very large protest that got out of hand and turned into a riot.

The Multi-District Study asked respondents four questions related to news coverage in the tested areas. The survey revealed that D.C. is an outlier when it comes to saturation coverage. Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia. (Ex. A, fig. 6). D.C. residents have been inundated with one-sided coverage of the events surrounding J6, are surrounded by residents who feel personally impacted by J6, and clearly have been jaundiced towards the Defendants. The survey demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in J6 as compared to their D.C. counterparts many of whom, according to the study, closely following J6 coverage.

### D.        Proximity of Publicity to Trial

The *Skilling* Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's

---

[8] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

[9] *Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murde*r, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-thecapitol-hillinsurrection- trump-was-an-accessory-to-the-crime-of-murder-99705925960 (last visited March 28, 2022).

bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  Again, this factor weighs heavily in favor of relocating the trial from D.C.

Ongoing negative publicity generated by congressional committees creates presumed prejudice for defendant Wood.  In fact, the Defendant respectfully submits that requiring him to go to trial in the District in the shadow of the Select Committee's investigation, would be highly prejudicial.  The Court of Appeals for the First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952).  In *Delaney*, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. *Id*. at 114.  The *Delaney* Court ruled that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.

*Id*. at 114.

The Court of Appeals for the District of Columbia dealt with a similar issue during Watergate.  Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge.  Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because it was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United* States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity requires the Court to either grant a lengthy continuance or transfer venue to a federal district that is not as impacted by the Select Committee's work.  The instant case is far worse than *Delaney* and *Ehrlichman*.  On top of the Select Committee, J6 is reported on every day in local news. The one-year anniversary of the event, as well as recent sentencings of high-profile J6 defendants, have kept the matter in the forefront of local discourse. There are daily stories about the congressional investigation into the events of J6, revealing new details, often with a political spin.  Multiple Trump Administration officials have refused to testify before the Select Committee for various reasons, creating an aura of suspicion in the minds of potential D.C. jurors that they may be hiding incriminating information.

On January 7, 2021 Rep. Bennie Thompson (D-MS), now the Chairman of the Select Committee to Investigate the J6, stated in an official statement, that

> [w]hat occurred yesterday at our nation's Capitol was – pure and simple –
> domestic terrorism incited by President Trump, his enablers, and those seeking to
> overturn the results of a legitimate election. January 6, 2021 will go down in history
> as the date that an angry mob of domestic terrorists and insurrectionists illegally
> tried to prevent our elected representatives from fulfilling their constitutional duty in
> the orderly transfer of power. It was a sad day for our democracy[.][10]

In July 21, 2021 Speaker Pelosi released her statement on Republican recommendations to serve on the House Select Committee to Investigate the January 6th Attack on the United States Capitol.[11] In the Speaker's statement, without a trial, she pronounced definitively that "January 6th [was an] "Insurrection" and authorized the Select Committee to "investigate and report upon the facts and

---

[10] *The Hon. Bennie Thompson's Official Statement:*
https://homeland.house.gov/news/pressreleases/chairman-thompson-statement-on-domestic-terrorist-attack-on-capitol

[11] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

causes of the *terrorist mob attack.*"[12]  Most recently, the Select Committee provided information it

obtained through its contemporaneous investigation on an individual named Ray Epps, before the

Department of Justice made any specific production to any defendants.[13]  On April 8, 2022 it was

reported that:

> The House Select Committee Investigating the violent breach of the U.S.
> Capitol building on January 6, 2021, has reportedly uncovered evidence that
> shows that there was coordination between two white supremacist militias during
> that event — and that those militias may have also coordinated with organizers of the
> "Stop the Steal" rally that proceeded the attack on Congress.[14]

And the *New York Times* has reported that "[t]he House committee investigating the Jan. 6

attack on the Capitol said on Wednesday that there was enough evidence to conclude that former

President Donald J. Trump and some of his allies might have conspired to commit fraud and

obstruction by misleading Americans about the outcome of the 2020 election and attempting to

overturn the result."[15]  The Select Committee's one-sided perspective on the events of J6 has

caused significant prejudice for the Defendant.

Likewise, incendiary statements made by Attorney General Merrick Garland have tainted

the District of Columbia's jury pool.  General Garland, for instance, has repeatedly compared J6 to

---

[12] *See Id*.

[13] After senators brought Epps up in a hearing, a Jan. 6 committee spokesperson released a statement last week, saying Epps "informed us that he was not employed by, working with, or acting at the direction of any law enforcement agency on January 5th or 6th or at any other time and that he has never been an informant for the FBI or any other law enforcement agency."  Select committee member Rep. Adam Kinzinger, an Illinois Republican, said that Epps "didn't enter the Capitol on Jan. 6 and was removed from the most wanted list because, apparently, he broke no laws."

[14] Report: Jan. 6 Committee Finds Connections Between Militias & Rally Organizers By Chris Walker, TruthOUT.com April 8, 2022 https://truthout.org/articles/report-jan-6-committee-findsconnections-between-militias-rally-organizers/ (emphasis added).

[15] *Jan. 6 Committee Lays Out Potential Criminal Charges Against Trump* By Luke Broadwater and Alan Feuer, New York Times, March 2, 2022, https://www.nytimes.com/2022/03/02/us/politics/trump-criminal-charges-jan-6.html

the Oklahoma City bombing case, alleging at his confirmation hearing that "there was a line that

connected the January insurrection to the Oklahoma City bombing and back to the battles of the

original Justice Department against the Ku Klux Klan."[16]  In a June speech to DOJ officials, the

Attorney General "compared the 1995 Oklahoma City bombing to the Capitol riot of January 6

when unveiling the Justice Department's response to the Biden Administration's new anti-domestic

terrorism strategy."[17]  The Attorney General's repeated comparisons of the Oklahoma City

bombing to J6 is particularly relevant to this motion as the Attorney General, a senior DOJ official

at the time, supervised the prosecution of Timothy McVeigh and his co-conspirators.[18]  During his

prosecutorial leadership, Garland agreed with defense attorneys that the Eastern District of

Oklahoma could not provide the Oklahoma City defendants a fair trial, and consented to a transfer

of venue.  *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla 1996) ("There is no

disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The

effects of the explosion on that community are so profound and pervasive that no detailed

discussion of the evidence is necessary.").[19] *A priori*, if the events of J6 are comparable to the

Oklahoma City case in the opinion of the Attorney General, who in 1995 agreed to a transfer of

---

[16] Zoe Tillman, *Merrick Garland pledged to investigate the Capitol insurrection*, Buzzfeed (Jun. 15, 2021), https://www.buzzfeednews.com/article/zoetillman/merrick-garlandinvestigate-capitol-riots-attorney-general.  See also (AG Garland speech on combatting domestic terrorism) (Jun. 15, 2021), https://www.youtube.com/watch?v=6-_loIzn5Bo (Jun. 15, 2021).

[17] Jerry Dunleavy, *Merrick Garland ties Oklahoma City bombing to Capitol Riot*, Wash. Examiner (Jun. 15, 2021), https://www.washingtonexaminer.com/news/garland-oklahomacity-bombing-capitol-riot.

[18] Wash. Post (Feb. 21, 2021) (video of testimony of AG confirmation hearing), https://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-dangerousperiod-than-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01b07e-6b937d75b3d8_video.html.  See also Dana Milbank, *Merrick Garland lets domestic terrorists know there's a new sheriff in town*, Wash. Post (Feb. 22, 2021) ("Garland . . . prosecuted the Oklahoma City bombing perpetrators before becoming a federal judge[.]").

[19] The Government's suggestion that McVeigh prosecutors agreed to transfer the case from Oklahoma City because the "federal courthouse was itself damaged during the bombing" is not accurate.  The McVeigh court clearly indicated that the Government agreed that McVeigh's ability to receive a fair trial in Oklahoma City was "chancy."  McVeigh, 918 F. Supp. at 1470.

venue in the latter case, logically a comparable transfer of venue in the instant case would comport

with consistent treatment of defendants.


### E. <u>Presumed Prejudice</u>

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was

lacking in that case.

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In *Rideau*, *Estes*, and *Sheppard*, in marked contrast, the jury's verdict did not undermine in any way the supposition of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383.

Unlike the defendants in *Skilling*, to date, the two J6 trials before juries have resulted in

unanimous jury verdicts promptly returned:  The first trial summary, according to the *N.Y. Post*:

"[T]he first jury trial for a Capitol protestor from January 6, 2021 led to Guy Reffitt, a 49-year-old

member of the far-right "Texas Three Percenters" militia group, was found guilty on all five of the

felony charges he faced, including bringing a gun onto the Capitol grounds and obstructing an

official proceeding.  A federal jury in Washington, DC, handed down the unanimous verdict

against Reffitt after just two hours of deliberation."  (See. Guy Reffitt found guilty in first Capitol

riot trial, By Emily Crane and Jorge Fitz-Gibbon, New York Post, March 8, 2022,

https://nypost.com/2022/03/08/guy-reffitt-found-guilty-in-first-capitolriot-trial)

Most recently, on April 14, 2022, "[a]fter less than three hours of deliberations, a

Washington, D.C., jury found Dustin Thompson guilty of multiple charges stemming from his

participation in the January 6, 2021, Capitol assault, including obstructing Congress' certification of

the Electoral College votes and stealing liquor and a coat rack from the Capitol building.  He likely

faces a maximum sentence of 20 years in prison." (See Ohio man who argued he was "directed" by

Trump to join the Jan. 6 Capitol riot convicted on all counts,  CBSNews, By Robert Legare, April

14, 2022 Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts - CBS News)

a. **The Multi-District Study**

The Multi-District Study found that while the tested areas differ from each other in geographic location, demographic composition and political party alignment, the non-D.C. areas produced remarkably similar results to each other on most questions in the survey, with the D.C. standing apart.  (Exh. A at 2.)  Notably, the Eastern District of Virginia is consistently more in line with North Carolina and Florida than the District:

> "Q3. 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.
> • Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.
> • Q6. 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.
> • Q9. Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. The median in the Study was 20%.

Also noteworthy are the results on preconceived beliefs that the J6 defendants preplanned to go into the Capitol:



(Exh. A, fig. 1).  Well over the majority, 71% of D.C. residents believe that J6 was preplanned,

whereas discovery has produced no evidence that the Defendant planned the Capitol breach or even

planned to march to the Capitol that day.  This result is significant on the issue of intent, which is

an essential element of a number of the charges.   The Defendant would face a jury in the District

of Columbia that overwhelming doubts his major defense, i.e., that there was no preplanning of J6.

The Multi-District survey also confirms substantial bias in D.C.'s potential jury pool:



(Exh. A, fig. 2).  Again, this survey shows the significant percentage with which the District of

Columbia surpasses the three other jurisdictions by well beyond the margin of error:

 This bias is not only more prevalent in the DC Community, but it is also more intense. The DC Community also admits making more than one prejudicial prejudgment at a much higher rate than respondents from the other Test Areas. In fact, 30% of DC Community respondents admit that they have already made every prejudicial prejudgment tested for in the survey – double the rate of the next highest Test Area.

(Ex. A at p. 2).

**b. Analysis by the Federal Public Defenders' Office:**

Significant majorities of potential jurors in DC have prejudged the January 6 defendants. The D.C. Federal Defender's Office (the "PD Survey") commissioned a survey of potential jurors. The PD Survey shows that a significant percentage of D.C.'s potential jurors harbor negative attitudes of J6 defendants and have already concluded that they are guilty.  (Case No. 1:21-cr-00024-EGS, ECF 101-1, Select Litigation Report commissioned for the PD, D.C., with appendices), and hereby incorporated for these Defendants.

(Attached hereto as Exh. B).

The PD Survey by polled 400 potential D.C.  jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia, similar in a few factors to the District of Columbia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6.  (Exh. B).  The PD Survey found that most District of Columbia residents prejudged the defendants as generally "guilty" and prejudged the element essential to intent. (Exh. B, at  ¶¶14, 10, 15, 18).   Significant majorities in the District would characterize J6 protestors as "criminals" (62%) and have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%).  (Exh. B, at ¶¶ 14, 10).

Typically, one would expect most respondents to reserve judgement on guilty or innocence. Yet over half of the District's survey respondents were willing to admit that they are more likely to vote "guilty" if they find themselves on a jury in a J6 case (52%).  (Exh. B, at ¶ 1).  And potential D.C. jurors (85%) believe that J6 protestors were "insurrectionists" (72%) and entered the Capitol

to try "to overturn the election and keep Donald Trump in power."  (Exh. B, at ¶ 15, 18).  Those surveyed have prejudged these key elements of the Defendant's central defenses.  In the PD Survey, in reviewing the same questions asked of 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, significantly fewer potential jurors have the bias against January 6th defendants when compared to the District of Columbia. (Exh. B, at ¶ 19-23).

**c. Analysis by Zogby Polling Co.**

One J6 Defendant, Garcia, filed a Motion to Transfer Venue and attached a Survey for the District of Columbia by Zogby, Inc., a well-regarded polling company.   (Case 1:21-cr00129-ABJ, ECF 54-1 Filed 02/01/22, attached hereto as Exhibit C).  This survey polled 400 D.C. residents in January of 2022.  The Zogby poll and *Garcia* filing is hereby incorporated into this filing.  The Zogby poll found that:

> --88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder;
> --73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;
> --A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for other protestors' violence and destruction of property;
> --70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

The findings on the Multi-District Study show results that are in line with both the PD and Zogby surveys showing evidence of prejudgment bias as to overall guilt and on the element of intent, even when compared with the closest neighboring jurisdiction, the Eastern District of Virginia.

In *Skilling*, Justice Sotomayor, J. wrote,

> I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely

high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron's one-time chief executive officer (CEO, Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of venue, they required the District Court to conduct a thorough voir dire in which prospective jurors' attitudes about the case were closely scrutinized. The District Court's inquiry lacked the necessary thoroughness and left serious doubts about whether the jury empaneled to decide Skilling's case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom. Accordingly, I would grant Skilling relief on his fair-trial claim.

*Skilling*, 561 U.S. at 427.  (Justice Sotomayor, J. concurring in part and dissenting in part).

### d. Alternate Venue

Accordingly, the Defendant cannot obtain a trial by an impartial jury in the District of Columbia.  Defendant Wood submits that the Eastern District of Virginia would be an appropriate alternative venue.  The Eastern District of Virginia in Alexandria is just over 8 miles away from the federal courthouse in D.C.  Although a short distance from the District of Columbia, the Eastern District of Virginia offers potential jurors shown to be significantly less biased.  This change of venue would result in very little inconvenience for the Court, and would actually be a more convenient (and safer) location for many other participants in the trial.  Moreover, the Court would avoid the very distinct risk of having to potentially try the instant cases twice, as multiple surveys provide documented proof that substantial prejudice exists in D.C.'s jury pool, and case law suggests that a highly publicized congressional inquiry generating negative headlines against the J6 participants *during their trial* could be grounds for a mistrial or a new trial on appeal.

While pretrial publicity of the Capitol incident exists in other areas of the country, the personal impact J6 had on District residents requires a transfer.  The District of Columbia is further shown to have over 66% as personally impacted by a "fear of personal safety."  The District of Columbia's jury pool is saturated with prejudice.  Moreover, the notion that more than 4 out of 10 jurors would assume that J6 was "racially motivated" is disturbing and incorrect.  The J6 Defendants should not have to prove that they are not racists.  And the work of the Select

Committee is a daily dose of additional media coverage; the Resolution for the Committee, in fact labels these Defendants as "domestic terrorists."

## III.    <u>CONCLUSION</u>

Based on the foregoing, Defendant Wood has demonstrated that he faces significant prejudice in the District of Columbia and will be unable to have a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

Accordingly, Mr. Wood requests that this Honorable Court transfer this matter to the United States District Court for the Eastern District of Virginia, pursuant to Fed. R. Crim. P. 21(a).

Respectfully Submitted,

By: Kira Anne West

_____/s/_____
Kira Anne West, Esq.
DC Bar No. 993523
712 H. Street N.E., Unit 509
Washington, D.C. 20002
(202)-236-2042
kiraannewest@gmail.com
Attorney for Mr.        Wood

### <u>Certificate of Electronic Service</u>

I hereby certify that on April 27, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties of record.

_/s/_ Kira Anne West_____
**Counsel for Defendant Wood**