## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MATTHEW MARK WOOD,**<br><br>    **Defendant.** | **Case No. 21-CR-223 (APM)** |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Mark Wood to 57 months' incarceration, the mid-point of the guideline range of 51-63 months, three years of supervised release, $2,000 in restitution, and a total mandatory special assessment of $225 for the six counts of conviction.

### I.    INTRODUCTION

The defendant, Matthew Mark Wood, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

Messages as early as January 1, 2021, show that Wood knew that January 6 "is going to be

---

[1] As of October 17, 2022, the approximate losses suffered because of the siege at the United States Capitol was $ 2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

wild!" and that Wood was "down for whatever they want to do!"[2] Wood also predicted on January 5, 2021, that if "they" lost Georgia that night, "Things are about to blow the lid tonight and tomorrow. [ . . . ] I am preparing myself to be there [Washington, D.C.] until Thursday."[3] Wood was prepared to sign up to "raid Congress" and "be brave heart in that bitch!"[4] Wood also bragged about being prepared to die and shed blood.[5]

Wood traveled with his grandmother and his friend from North Carolina to Washington, D.C., arriving in the early morning hours of January 6. While eating brunch, Wood saw dozens of Metropolitan Police officers riding towards the Capitol as well as "People from all ends of the city [ . . . ] flocking to the Capitol."[6] Wood joined hundreds of other rioters as they marched towards the U.S. Capitol.[7] Wood's grandmother and his friend stayed back. Wood entered restricted Capitol Grounds at the Peace Circle and continued forward and into the violence of the West Plaza, climbing the media tower. Wood eventually continued through police lines up to the threshold of the Capitol and then into the Capitol itself, making good on his readiness to "raid Congress." Wood was one of the first rioters to enter the Capitol. He was also one of the last ones to leave.

To Wood, his participation in the storming of the Capitol was in furtherance of "a deeper cause than [the former President.]"[8] Several days before heading to Washington, D.C., Wood acknowledged that any potential path to the presidency for the former president "don't seem

---

[2] Gov't Ex. 01, pp. 7, 13.

[3] *Id*. at 19.

[4] *Id*. at 7.

[5] *Id*. at 10.

[6] *Id*. at 29-32.

[7] https://youtu.be/CPPZP9rddhc?t=402

[8] Gov't Ex. 01, p. 4.

likely."[9] Later on in the day, after an individual told Wood that "Trump ain't worth dying for," Wood responded by declaring, "It's not Trump it's America that's at stake!"[10]

Once Wood began his trespass onto restricted Capitol Grounds, Wood stood with rioters on the West Plaza, climbed the media tower, and encouraged others forward. Wood also incited others to violence, calling rioters forward, waving a blue Trump flag he found on the ground, and inspiring the crowds to continue their siege of the Capitol.

Wood was the tenth rioter to breach the Capitol specifically through the broken-out window north of the Senate Wing Door, and he would later boast about being "one of the first ones to storm inside."[11] As soon as he got inside, Wood joined the likes of Doug Jensen[12], Jacob Chansley[13], Kevin and Hunter Seefried[14], and Greg Rubenacker[15] in pursuing police officers through the Brumidi corridors (1st floor), past the Senate Carriage Door (1st floor), up a staircase, and to the Ohio Clock corridor (2nd floor). Wood then left that group and backtracked to the first floor, back past the Senate Carriage Door, through the Brumidi corridors, and past the Senate Wing Door to the Capitol Crypt (1st floor). Wood then went through the Small House Rotunda (1st floor), up to the second floor Small House Rotunda, and once on the 2nd floor for the second time, Wood went through the House Speaker's suite of offices (entering at least three offices and the Speaker's conference room). Wood then entered the Capitol's Grand Rotunda, went towards the Senate

---

[9] *Id*. at 17.

[10] *Id*. at 26.

[11] *Id*.

[12] *United States v. Douglas Austin Jensen*, 21-CR-6 (TJK).

[13] *United States v. Jacob Anthony Chansley (aka Jacob Angeli)*, 21-CR-3 (RCL).

[14] *United States v. Kevin Seefried, and Hunter Seefried*, 21-CR-287 (TNM).

[15] *United States v. Greg Rubenacker*, 21-CR-193 (BAH).

Chamber, back to the Rotunda, and towards the House Chamber. At the House Chamber, Wood was close enough to the front of the group to be able to tell others that he and other rioters "just broke through Capitol police" and that they were "going to bust into the house chambers."[16] He was also close enough to know that U.S. Capitol Police drew their firearms to protect the House Chamber, telling a group chat that "Alarms are blaring," and "We are trying to take the house but they are pulling guns!"[17] After being "hit with a tear gas bomb"[18], Wood returned to the Rotunda.

There, Wood very nearly left the Capitol through the East Rotunda Doors. Instead, he turned back and on separate occasions, directly pushed against MPD officers attempting to clear the Rotunda. Eventually, Wood was finally forced into the foyer between the Rotunda and the East Rotunda Doors and then out of the Capitol building. Wood spent a total of approximately eighty minutes in the Capitol, from 2:13 p.m. to 3:33 p.m., a very substantial period of time in the context of the January 6 riot. Later that afternoon, when someone asked why he was there, Wood responded, "I'm tired of our elected officials! Every last one of them. Republican and Democrats."[19]

Wood posted messages to social media and sent messages to others glorifying violence and defending the rioters, even while he was inside of the Capitol on January 6, 2021. Wood also made posts and sent messages before and after January 6 that evinced a knowledge of what was going on inside the Capitol and a specific intent to disrupt the proceedings and occupy the Capitol.

On January 10, 2021, when an individual tried to blame "the left," Wood was quick to retort, "I think some of them did lead the effort but as someone who seen it unfold, a lot of this

---

[16] Gov't Ex. 01, p. 32.

[17] *Id*. at 33.

[18] *Id*.

[19] *Id*. at 4.

was angry Americans tired of Congress. American flags, don't tread on me flags and trump flags covered the Capitol."[20] On January 11, 2021, Wood sent a photograph[21] to the friend who came with him to Washington, D.C., but did not enter the Capitol. Wood told his friend to "Zoom in and read that white flag."[22] The white flag Wood referenced reads, "WE THE PEOPLE WILL BRING DC TO ITS KNEES WE HAVE THE POWER."[23] When his friend responded, "Jesus", Wood messaged back, "Damn right!"[24]

Soon after January 6, Wood deleted his Facebook account. When, on January 7, someone asked if another person made him delete his Facebook posts, Wood responded, "No, I did so on my own accord."[25] Not coincidentally, also on January 7, after another individual told Wood that he was "NOT on the FBI list," Wood responded by asking how big the list was and then asking if the list is "a growing list or that seems to be set?"[26] Wood also had a discussion with an individual about what happened that day, but only after the individual agreed to delete the conversation.[27] After the individual promised to do so, Wood bragged,

> We started off as a civic protest but it quickly turned into chaos. We pushed up the steps, the cops were overcome and we the people stormed the capitol and we filled the halls of Congress and filled Nancy's office. Others destroyed her office and a woman I pushed through a hall with was shot and killed.[28]

When the individual then confirmed that Wood wanted him to delete the conversation, Wood

---

[20] *Id*. at 28.

[21] *Id*. at 13.

[22] *Id*.

[23] *Id*. at 14.

[24] *Id*. at 15.

[25] *Id*. at 22.

[26] *Id*. at 13.

[27] *Id*. at 1.

[28] *Id*.

responded, "If you will, thank you."[29] Wood also encouraged others to delete their social media accounts.[30] In his interview with the FBI, Wood also admitted to deleting images showing him inside the Capitol from his phone.

Although Wood knew that he "unlawfully entered a federal building" and that a "crime was committed," he subsequently took a vacation to Disney World, and then called his local FBI field office.[31] Even while turning himself in, however, Wood misrepresented many facts and circumstances of that day. For example, he claimed that he did not want to go inside the Capitol, but that the crowd carried him forward and pushed him inside. Wood also claimed that he was looking for an exit the entire time he was inside the Capitol. The surveillance and open-source video of Wood, as well as the messages he sent to others while inside the Capitol, construct a different narrative.

The government recommends a sentence of 57 months' incarceration, which is within the advisory Guidelines' range of 51-63 months, which the government submits is the correct Guidelines calculation. A 57-month sentence reflects the gravity of Wood's conduct.

## II.   FACTUAL BACKGROUND

### A. Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol

---

[29] *Id*.

[30] *Id*. at 36.

[31] *Id*. at 12.

Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



***IMAGE 1:*** *Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the

outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*IMAGE 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



**IMAGE 3:** *The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

### B.  Injuries and Property Damage Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral

system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Howell, C.J.).

In addition, the rioters injured more than a hundred members of law enforcement.[32] Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers.[33] The rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their physical safety.[34] [35]

The rioters also stole, vandalized, and destroyed property inside and outside the Capitol. They caused extensive losses. In some instances, those losses are incalculable. This includes wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.[36] [37] The attack resulted in substantial damage to the U.S. Capitol, resulting in

---

[32] Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf.

[33] *Id*. at 27-30.

[34] *Id*.

[35] Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf.

[36] *Id*.

[37] United States House of Representatives Curator Farar Elliott, Statement Before the House

losses of more than 2.8 million dollars.

### C.  Wood's Role in the January 6, 2021, Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, Wood lived with his brother in Reidsville, North Carolina, and worked as a cellphone sales representative. As outlined above, Wood understood going to Washington, D.C., on January 6, 2021, was going to be driving into a powder keg while giving off sparks. His violent rhetoric came through in messages sent on January 1 and 2 and continued through the moment when he made good on that rhetoric. One important exchange wased between Wood and Individual 12 on January 2, 2021. When Individual 12 asked if Wood learned anything that day, Wood responded, "Actually I did. Some interesting things are happening."[38] When Individual 12 clarified if Wood was talking about the Presidential Election, Wood responded, "Yeah! Next Wednesday."[39] "Next Wednesday" was, of course, Wednesday, January 6, 2021.

| **Individual 12:** | Oh god! What? Is it possible for trump to still win |
|---|---|
| **WOOD:** | Yes and no, there are about three paths he can take. However, they don't seem likely. They are going to attempt them all.[40] |

Even though January 6, 2021 was about the certification of the electoral college vote, a fact about which, again, Wood was aware, Wood indicated in another message that the level of hostility to the certification process was correlated with the election results in Georgia. Specifically, Wood

---

Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf.

[38] Gov't Ex. 01, p. 17.

[39] *Id.*

[40] *Id.*

predicted, "Things are about to blow the lid tonight and tomorrow."[41] When Individual 13 asked if he really thought so, Wood responded, "Oh if we lose tonight [in Georgia] it definitely will be! I am preparing myself to be there until Thursday."[42] Wood knew that violence in Washington, D.C., was likely and possible. And Wood was there for it, in both the figurative and literal senses.

On January 5, 2021, Wood traveled from North Carolina to Washington, D.C., with his grandmother and a friend. As discussed above, and as the first part of the Group 1[43] chat shows[44], Wood knew what was happening at the Capitol, knew that MPD officers were moving towards the Capitol, and knew that other people were flooding in. As seen in this open-source video[45], Wood can be seen walking without either his friend or his grandmother but with other protestors down Pennsylvania Avenue towards the Capitol.

---

[41] *Id*. at 19.

[42] *Id*.

[43] "Group 1" is the name the government has given to a series of messages exchanged between Wood, his father (A), an undisclosed family member (B), his mother (C), and an undisclosed family member (D).

[44] Gov't Ex. 01, pp. 29-32.

[45] https://youtu.be/CPPZP9rddhc?t=402



*IMAGE 4: Wood walks down Pennsylvania Avenue with other protestors but without his grandmother or friend.*

As was the case with many rioters that walked down Pennsylvania Avenue, Wood arrived at the Peace Circle and then made his way up Pennsylvania Walkway.

 

*IMAGES 5a, 5b: Screenshots from Gov't Ex. 06, a video recovered from Wood's phone that shows the pathway that Wood took through restricted Capitol grounds leading up to the West Plaza of the U.S. Capitol.*

One he arrived on restricted grounds, Wood joined the violent crowd on the West Lawn and West Plaza of the Capitol. Surveillance and open-source video show that Wood got close to the line of USCP officers attempting to hold back that first wave of rioters.



**IMAGE 6:** *A selfie style photograph that Wood took of himself while standing on the West Plaza of the Capitol.*



**IMAGE 7:** *Wood yelling and pointing towards the Capitol while standing in close proximity to the line of USCP officers who were then attempting to hold back the first wave of rioters.*



**IMAGES 8a, 8b:** *A photograph that shows WOOD as part of the first wave of rioters to confront police officers in the West Plaza and an enlargement of the portion of that same photograph in which WOOD appears.*



**IMAGE 9:** *Wood standing atop the media tower on the West Plaza while using his cellphone in a manner consistent with recording a video or taking photographs.*

 

*IMAGES 10a, 10b: Screenshots from Gov't Ex. 07, three videos recovered from Wood's phone that were recorded atop the media tower. Image 10a (left) shows the West Plaza filled with rioters and an individual above The Tunnel discharging a fire extinguisher on top of USCP officers. Image 10b (right) shows USCP surrounded and cornered in the southeast corner of the West Plaza.*

### *Waving His Flag on the Scaffolding*

When the rioters encountered police officers on the West Plaza, their momentum was not stopped, only redirected. One of the key directions in which the rioters were redirected was up the stairs under the NW scaffolding. As seen in a publicly available video that (originally posted to TikTok)[46], Wood was among the first to rush into that area. The video shows him trying to raise

---

[46]

https://ia802203.us.archive.org/0/items/pWYgvmaAfKAZt4eaS/pWYgvmaAfKAZt4eaS.mpeg4

and waive his flag.

The scaffolding was at the time being prepared for the upcoming Presidential Inauguration, and as such, it was covered in white tarps. The rioters cut and ripped holes in the tarp to provide easier access to the stairway under the NW scaffolding up to the NW Plaza and the Capitol. Wood took advantage of one of these holes to scream out to, encourage, and incite the other rioters.[47]



*IMAGE 11: A screenshot from a publicly available video where a photographer who was at the Capitol on January 6 goes through many of his photographs while giving context and commentary.*

As stated in the caption to Image 11, although that is a screenshot from a publicly available YouTube video, the video itself is a series of photographs taken by the individual who appears in the bottom-left corner of the screen. During the YouTube video, and while speaking of the photograph shown in Image 11, the photographer stated:

This guy [Wood] was screaming very, very intensely. You know? "Come on!" "Move

---

(at approx. 00 min. 09 sec.).

[47] https://youtu.be/mZ2sQax3_xo?t=3835.

forward!" He was shaking when he was screaming, and this is exactly what I am talking about when I'm trying to capture human emotion, right? This passion, this yelling, this is the kind of picture I really really came for, and this is what I was always intentionally, originally, aiming to capture. I thought this kind of reaction and emotional passion was going to come from Trump's speech in revealing some new evidence. But it did not. It came from the Capitol Building.

Once a wider hole was cut through the tarp and more of the sheeting was pulled down, Wood climbed to a position of prominence on the scaffolding and remained there from approximately 2:04 to 2:13 p.m. waiving his flag, waiving his arm, and yelling and screaming for other rioters to move forward. As the photograph below shows, Wood was facing out towards a group of rioters on the restricted Capitol Grounds of the West Lawn. In this picture, the rioters were still behind the line of vastly outnumbered USCP officers, but it was precisely them to whom Wood was yelling and beckoning. He waved his Trump flag high to encourage and incite them to move forward. Eventually they did. The photograph also shows how close Wood was to the rioters who are fighting with the police officers on the right side of this photo. Several of these officers were assaulted and injured at this same time as rioters attacked them in order to gain access to the NW Plaza and the Capitol itself.



**IMAGE 12:** *Another screenshot from YouTube user "Logan M"'s video (cited in fn. 47 above) in which Wood features.*

While making his way from the West Plaza up to the NW Plaza, Wood stood for nearly ten minutes in a hole cut in white tarp of the inaugural scaffolding, waving his flag high and waiving his arm, beckoning the crowd forward.[48] Wood was quite close to the police line, and at times, he seemed to turn and look directly at the rioters fighting with the police.

---

[48] See CCV screenshots attached as EXHIBIT 04. To the extent that the screenshots show a time, the time shown is Coordinated Universal Time (UTC), which is approximately five hours ahead of Eastern Time on January 6. For example, in Image 13 (below), the time shown is 19:05:57, which less five is 14:05:57. Converted to 12-hour time, that becomes 2:05:57 p.m.



**IMAGE 13:** *A screenshot from USCP CCV at 2:05 p.m. showing Wood hanging off the scaffolding by the NW staircase waving others forward. The USCP line was still holding rioters back at this point.*



**IMAGE 14:** *A screenshot from USCP CCV showing Wood walking up the balustrade of the NW staircase, flag held high, in the moments after other rioters violently breached the line of USCP officers on the landing to Wood's right.*

A video from another angle shows Wood waving his flag while hanging off the scaffolding

just thirty seconds before the line of police officers was breached and the rioters flooded up and

into the NW Plaza.



*IMAGES 15a, 15b, 15c: Three screenshots recovered from another rioter's cellphone showing Wood standing in a position of prominence above most rioters, waving his flag and calling people forward. The screenshots also show the rioters swarming up the staircase and Wood continuing to advance as soon as the line of USCP officers falls.*



*IMAGE 16: A photograph showing how close Wood was to the line of USCP officers and how he continued to wave his flag and incite other rioters even while injured officers were being assisted off scene.*

Once Wood reached the NW Plaza, he ran towards the Senate Wing Door and to the front of the crowd. It was also at this time that rioters broke out the window to the south of the Senate Wing Door and began swarming through.



**IMAGE 17:** *USCP surveillance showing Wood, scarf billowing behind him, running from the NW staircase into the NW Plaza and towards the Senate Wing Door. Less than a minute later, Wood would be inside the Capitol.*

### Breaching the Capitol

Despite the fact that Wood was still entering the NW Plaza when other rioters were first breaking out windows and breaching the door, Wood made his way to the front of the crowd and became the tenth rioter to enter the Capitol through the broken-out window to the north of the Senate Wing Door. He was one of the first of what would be thousands of rioters to illegally enter the Capitol on January 6, 2021. Wood was the tenth person to enter through that window, and did so at approximately 2:13 p.m.



**IMAGE 18:** *A screenshot from USCP CCV showing Wood as the tenth rioter to enter the U.S. Capitol through the broken-out window to the north of the Senate Wing Door.*

Once inside, Wood ran from location to location, making his way into many more locations within the Capitol than most other rioters.[49] As mentioned above, Wood joined other rioters in confronting USCP officers and pursuing them through the Brumidi corridors, past the North Door exit, past the Senate Carriage Door exit, and up to second floor and the Ohio Clock Corridor. At the Senate Carriage Door exit in particular, USCP officers attempted to usher Wood and the others in that group out that exit. Wood and most others refused. Instead, they insisted on gaining broader access to the Capitol, threatening, rushing towards, and pushing back USCP officers. Wood and the group pursued the police officers up a staircase to the second floor and into the hallways that surround the Senate Chamber. As seen in the image below, Wood was part of the initial standoff between rioters and police officers in an area known as the Ohio Clock Corridor.

---

[49] *See* Gov't Ex. 02.



**IMAGE 19:** *Wood and other rioters engaged in a standoff with officers just outside the Senate Chamber in an area known as the Ohio Clock Corridor.*



**IMAGE 20:** *An image recovered from Wood's phone that shows the rioters closing in on the line of USCP officers in the Ohio Clock Corridor at approximately 2:16 p.m.*

Wood arrived at the Ohio Clock Corridor at approximately 2:16 p.m. After a few moments, Wood left, took a few photographs, and retraced his steps back to the first floor and the Senate Carriage Door. There, USCP officers again attempted to force Wood and others out of the Capitol, they refused to leave.[50]



**IMAGE 21:** *A screenshot from a video posted to the ITV News YouTube account showing Wood on his cellphone in the vicinity of the Senate Carriage Door. This is about the time Wood sent messages to his family's group chat telling them that he was "trapped" and "trying to fight back."*

At approximately 2:21 p.m., Wood sent an iMessage to a group chat in which he stated:

**WOOD:**    We just stormed the Capitol, we bust the door down. I'm in here trapped. The Capitol police have us pinned. We are trying to fight back.[51]

At approximately 2:22 p.m., Wood walked away from the police at the Senate Carriage Door, back through the Brumidi Corridors, and south past the Senate Wing Door. Wood then joined the growing mob of rioters in the Capitol Crypt, where police officers were attempting to

---

[50] https://youtu.be/UBp42536IhE?t=191

[51] Gov't Ex. 01, p. 32.

hold them back. Wood was not near the front line of the protesters at this time but was using his phone as rioters filled the Crypt.

At approximately 2:24 p.m., Wood sent an iMessage to the same group chat:

> **WOOD:**         We just broke through Capitol police, we are going to bust into the house chambers.[52]

As can be seen in USCP CCV, at approximately 2:24 p.m., when that message was sent, Wood was in the Capitol Crypt,[53] which is directly beneath the Rotunda on the first floor. This shows that about twenty minutes before he arrived at the House Chamber, Wood had already formed the intent to "bust into the house chambers."

At approximately 2:25 p.m., Wood sent an iMessage to Individual 8, in which he stated:

> **WOOD:**         We just stormed the Capitol now, we are busting into the house chambers
>
> **INDIVIDUAL 8:**   They have locked it down and sent them under tunnels to another building
>
> **WOOD:**         I know because we took the bitch over
>
> **INDIVIDUAL 8:**   You on the steps yourself?
>
> **WOOD:**         No I'm inside the building we busted the windows out [and] crawled through[54]

### *Breaching the House Speaker's Suite of Offices*

By 2:30 p.m., rioters breached the police line in the Crypt and Wood followed others through the Small House Rotunda, up a staircase by the Memorial Door to the second floor, and into the House Speaker's office suite. While walking into the Speaker's office suite, Wood filmed a video. In that video, the other rioters can be heard chanting "U-S-A! U-S-A!" One individual

---

[52] Gov't Ex. 01, p. 32.

[53] Gov't Ex. 02, pp. 23, 75.

[54] Gov't Ex. 01, p. 9.

yelled out, "Ms. Speaker!" Others repeat that cry. Other outbursts recorded on the video Woods filmed included, "Madam Speaker, we want to have a word with you!", "The people got somethin' to say!", and "Here's Johnny!"



**IMAGE 22:** *A screenshot from a video recovered from Wood's phone showing rioters storming into the House Speaker's suite of offices.*

At about 2:32 p.m., Wood and other rioters entered the Speaker's conference room. As they did, Wood's video focused first on a laptop sitting on the table. A video taken by another person from a different angle shows Wood grabbing a glass of water sitting on the table and taking a drink.[55] Before leaving the House Speaker's suite of offices, Wood entered the conference room and three other offices.[56] Wood also appears to have stopped at a security desk, taken a small object

---

[55]    https://www.newsflare.com/video/402653/mob-incited-by-trump-storms-interior-of-capitol-including-offices-of-mcconnell-and-pelosi-in-terrifying-act (timecode: 02:50).

[56] Gov't Ex. 02, pp. 34-44.

from the desk, and put it in his pocket.[57] As Speaker Pelosi told 60 Minutes, her staff, "went under

the table, barricaded the door, turned out the lights, and were silent in the dark under the table for

two-and-a-half hours." As shown in that program, the group of rioters, of which Wood was a part,

got to within a single door of the cowering and terrorized staffers.[58]



*IMAGE 23: A screenshot from a publicly available video showing Wood entering the House Speaker's conference room and taking a drink of water from a glass that was sitting on the table.*

---

[57] Gov't Ex. 02, pp. 41-42.

[58] https://youtu.be/RldpC8a9Zv4?t=193.

 

*IMAGES 24a, 24b: Screenshots from a video recovered from Wood's phone that shows Wood entering the Speaker's Conference Room, briefly filming the screen of a laptop sitting out on the table, and then picking up a glass and drinking from it.*



*IMAGE 25: A photograph recovered from Wood's phone that shows the interior of an office within the Speaker's suite of offices. Notable in this photograph is the broken glass on the floor and the broken glass of the framed picture hanging on the wall.[59]*

---

[59] This photograph appears to have been taken on House Speaker Pelosi's first day as Speaker in 2007. *See* https://www.nytimes.com/2019/01/02/us/politics/nancy-pelosi-house-speaker.html.

At approximately 2:36 p.m., Wood left the Speaker's office suite and entered the Capitol's Grand Rotunda. While in the Rotunda, Wood walked and marched around, waving his flag, using his phone, and carrying on as he had been for nearly two hours. At about 2:37 p.m., Wood left the Rotunda and went north towards the Senate Chamber, but he returned to the Rotunda a minute later, along with a cloud of chemical irritant. A video that Wood recorded shows that as soon as he got into the Small Senate Rotunda, there was a cloud from an unknown chemical agent looming heavily in the area, and Wood did not venture further north.



*IMAGE 26: A screenshot from a video recovered from Wood's phone. It shows the Small Senate Rotunda (2nd Floor) filled with an unknown chemical irritant and rioters dispersing in its presence.*

### Statuary Hall and "Bust[ing] into the house chambers"

At approximately 2:40 p.m., Wood went south out of the Rotunda towards the House chamber. He went through Statuary Hall—stopping to remove the velvet rope from each of six stanchions he passed—and dropping the rope to the ground.



**IMAGE 27:** *A screenshot from USCP CCV at 2:41 p.m. showing Wood walking through Statuary Hall, taking the velvet rope off each of the stanchions he passed, and dropping it to the ground.*

At 2:42 p.m., Wood having finally found the House Chamber, reentered the Rotunda, waved his flag, and called for protesters to come help.[60]

---

[60] *See* https://twitter.com/capitolresearc3/status/1579336952721313792.



**IMAGE 28:** *A screenshot from a publicly available video[61] showing Wood waving his flag at the entrance to the hallway that leads to the House Chamber. After he turns back towards the Chamber, several rioters follow.*

At 2:42 p.m., Wood went back to the threshold of the House chamber. By 2:46 p.m., Wood and the other rioters returned to the Rotunda, once again accompanied by a cloud of chemical irritant.

---

[61] https://youtu.be/TltdYZeukkM?t=148.



**IMAGE 29:** *A screenshot from USCP CCV showing Wood on his cellphone about the same time he was messaging his family group chat about "trying to take the house."*

At about 2:48 p.m., Wood sent an iMessage to the same previously mentioned group chat

in which he stated:

**WOOD:**     Guns are out (2:48 p.m.)[62]

   We are trying to take the house but they are pulling guns!
   (2:49 p.m.)

---

[62] Wood is likely referring to this moment when USCP officers drew their weapons on rioters who broke out the window of a door that led into the House Chamber (https://apnews.com/article/jan-6-capitol-siege-ap-photographer-1bd87e4d6fbe614e00fd4a5f885c2334/gallery/3461a357bdcf426e8b8f4522daf11f33).



**IMAGE 30:** *A photograph taken from inside the House Chamber at the moment that Wood and other rioters were at the threshold trying to break in.*

Wood then walked from the Rotunda to the foyer between the Rotunda and the East Rotunda Door. While he got very close to the exit, Wood did not leave. He returned to the Rotunda (2:50 p.m.), went back through Statuary Hall towards the House chamber (2:52-2:54 p.m.), and then returned to the Rotunda. By this time, however, MPD officers had arrived and were blocking access to other areas of the Capitol. The police officers were directing the rioters to move back and leave the Capitol through the East Rotunda Door. Many did. Wood did not.

**Battle in the Rotunda**



**IMAGE 31:** *A screenshot from USCP CCV showing Wood actively pushing against USCP and MPD officers with the other rioters as they attempted to keep from getting pushed back and out of the Capitol.*



**IMAGE 32:** *A screenshot from a publicly available video[63] showing Wood pushing back against MPD officers in the Rotunda while calling others to assist him and to resist the police..*

---

63      https://ia904509.us.archive.org/29/items/ocht2qoM5yHiaaGk4/ocht2qoM5yHiaaGk4.mpeg4
(timecode: 27:04)

The police officers began forcing the rioters to leave the Rotunda, but many rioters, including Wood, still refused to leave. On a couple occasions, Wood ran up to the police line to lend direct aid and assistance to the other rioters who were pushing against the police.



**IMAGE 33:** *A screenshot from a publicly available video[64] showing Wood assisting other rioters to push, obstruct, and impede police officers who were then attempting to clear the Capitol.*

---

[64] https://youtu.be/-r56gPEZMG4?t=182.



*IMAGE 34: A photograph not taken by Wood but recovered from Wood's phone. The photograph shows Wood directly behind those rioters who were up against USCP and MPD officers, lending support and strength to their efforts in resisting and pushing against the police..*

At one moment he pushed his body up against another rioter who was resisting a police officer. One several occasions he got right in the face of police officers to yell and wave his flag. As had been the case since the beginning of the Capitol siege, the police were deploying O.C. spray against the rioters and the rioters were deploying various chemical irritants, including wasp spray, bear spray, and O.C. spray, against the police. USCP CCV shows Wood reacting to a chemical irritant and momentarily retreating from the front line. He quickly regrouped, however, and returned again to the front line. An MPD officer against whom Wood was continually pressing eventually struck Wood in the back of the head, and it was only then that Wood finally left the Rotunda. Wood did not, however, leave the Capitol.

By 3:20 p.m., Wood and other rioters had been forced into the foyer between the Rotunda and the East Rotunda Door. At approximately 3:23 p.m., while still inside the Capitol, Wood sent an iMessage to an individual, in which he stated:

**WOOD:** Yes, I broke through the window. I lost [Individual 10]! It's chaos.[65]

At approximately 3:27 p.m., while still inside the Capitol, Wood sent an iMessage to Individual 9, in which he stated:

**WOOD:** I'm in the Capitol, we stormed it. I am fighting capitol police. Woman has been shot and killed. Call later. Also can't get out and my skin is on fire.[66]

Wood finally left the Capitol at approximately 3:33 p.m. but did not yet leave restricted Capitol grounds.



*IMAGE 35: A photograph recovered from Wood's cellphone showing him now on the East Steps of the Capitol.*

---

[65] Gov't Ex. 01, p. 17.

[66] *Id*. at 11.

*Post-Breach Social Media Posts and Messages*

Although the physical battle was over for Wood, he continued battling through social media posts. He uploaded pictures that he took while inside the Capitol to social media. The pictures were accompanied by the message,

> This is the PEOPLES house. We sent those politicians running. We sent a resounding message to Washington. We the PEOPLE will fight for our country. Make no mistake, the Capitol Police were not our target. They stood between us and the ones we wanted. America has fallen into the ruins of division. When diplomacy doesn't work and your message has gone undelivered, it shouldn't surprise you when we revolt.



**IMAGE 36:** *A screenshot of a post Wood made to Facebook before deleting his account.*

In another post, Wood wrote,

SOME condemned my actions today on Capitol Hill. I hear a lot of you complaining about the issues and you keep calling for something to be done. Yet, nothing has been done. Our election was stolen. The system is against us. I stood up to our tyrannical government. You can keep sitting or you can do something about it like we did today. Our nation has experienced necessary revolts before. Hopefully, Congress will listen to the PEOPLE.



*IMAGE 37: A screenshot of another of Wood's Facebook posts made after breaching the Capitol but before deleting his Facebook account.*

At approximately 6:57 p.m., Wood sent the following message to Individual 4:

**WOOD:**          We raided the whole building and sent Congress running. It initially was about Trump but it turned into a deeper cause than that. When Trump called us to stop, everyone verbally said no!

**INDIVIDUAL 4:**   Why were you there?

**WOOD:**          I'm tired of our elected officials! Every last one of them. Republican and Democrats[67]

---

[67] Gov't Ex. 01, p. 4.

At approximately 9:53 p.m., Wood sent the following iMessage to the previously mentioned family group chat:

**WOOD:**      7 agencies couldn't stop us, the FBI, Homeland Security, Metro Police, DC Police, Capitol Police, Secret Service, and National Guard[68]

On January 12, 2021, he sent Individual 13 the following message:

Oh I know, I am aware that they are going to impeach him and they are purging all conservative followers on all social media platforms. I ain't reading it or watching it but I am staying up to date. I am afraid this country is about to pop off. Make sure your household is ready. The gun stores are empty. Yesterday while we were there, everyone was talking about fighting their government. At this point ANYTHING can happen. Hell the stock market is on thin ice and out of control and investors are speculating the possibility of war...[69]

### *Wood's Self-Identification and Interview*

In the days following January 6, 2021, the FBI identified a screenshot of Wood in the Rotunda. Not knowing his name, they identified him as #71.[70] Wood saw this and indicated that he was going to turn himself in on January 14, 2021.[71] On January 15, however, Wood told Individual 16 that he was "going to enjoy this vacation of [his] for the next week and then face the music when [he] get[s] back."[72] Nearly three weeks after the riot, on January 25, 2021, Wood called his local FBI field office to identify himself, referring specifically to photograph number 71. When the FBI interviewed Wood at his house, he again admitted that the individual in photograph 71 was him.

---

[68] *Id.* at 34.

[69] *Id.* at 20.

[70] https://www.fbi.gov/wanted/capitol-violence-images/capitol-71arrested.jpg/image_view_fullscreen

[71] Gov't Ex. 01, p. 12.

[72] *Id.* at 23.



*IMAGE 38: A screenshot from the FBI's website featuring #71, an individual subsequently identified as Matthew Mark Wood.*

When speaking to FBI agents, Wood admitted he was present inside the Capitol on January 6, but he also omitted key details, minimized his participation, and lied to agents about his involvement. For example, Wood told the FBI that he had no intention of entering the Capitol, but once he was on Capitol grounds, he was forced to the threshold of the Capitol and forced through a broken window. As shown above, Wood deliberately and intentionally, and over an extended period of time, made his way purposefully to the Capitol. When he got to the NW Plaza, as can be seen in Image 17 above, there was no one behind him as he ran to the Capitol with his flag and his scarf billowing behind him. When he arrived at the Capitol, he was towards the back of the group of rioters gathered there. He maneuvered his way to the front and—as previously stated—was the tenth person to enter through that window.

He also claimed that the whole time he was inside the Capitol, he was looking for a way out. That is patently false. During his first few minutes inside the building, while walking up to the Ohio Clock corridor, he passed two clearly marked exits (the North Door and the Senate Carriage Door). On his way back from the Ohio Clock Corridor, not only did he pass the Senate Carriage Door, but he stood next to the door texting for a few minutes. Instead of leaving, he again passed by the North Door and walked past the Senate Wing Door without even glancing once at

that exit. Before going upstairs, he also walked by the Memorial Door, a clearly marked exit. Once he was in the Rotunda, the East Rotunda Door and exit was certainly an active location, but he could have made his way there and tried to leave. Instead, he attempted to go north to the Senate Chamber, South to the House Chamber, and then actively battled against the USCP and MPD officers in the Rotunda *instead* of leaving like they told him to. Once Wood left, his expressions were not those of remorse and contrition. His postings spoke of standing up against a "tyrannical government" and how January 6 was a "necessary revolt."

### *Deletion of Evidence*

As outlined above and in Gov't Ex. 01, Wood has been clear that he deleted his Facebook account and other social media accounts following January 6, and that the deletion was contemporaneous with him asking other individuals to check the FBI's website to see if he was yet on their wanted list. He also admitted to the FBI that he deleted photographs of himself in the Capitol. For example, Image 36 above shows a screenshot of a Facebook post. All the images shown in that post were later recovered from his phone, except the following image:



*IMAGE 39: A cropping of Image 36 to show the photograph that Wood deleted from his phone before speaking with the FBI.*

Wood admitted that he deleted other images of himself as well. This can also be seen by the fact that there are large gaps in the names of the images that were recovered from his phone. Normally, the names are created automatically and sequentially, but for the names of the images recovered from Wood's phone, there are many gaps in the sequence.

### III.   THE CHARGES AND IMPACT OF THE STRAIGHT PLEA

On March 17, 2021, a federal grand jury returned an indictment charging Wood with Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Entering and Remaining in Certain Rooms in the Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(C); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On May 27, 2022, Wood pled guilty to each of the six counts charged in the Indictment

without a plea agreement. The parties did agree to minimum or threshold facts that make out the elements of each of the offenses to which Wood pled guilty. ECF No 46.

## IV.   STATUTORY PENALTIES

Wood now faces sentencing on one count each of Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Entering and Remaining in Certain Rooms in the Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(C); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

Wood faces a term of imprisonment of up to twenty years, a term of supervised release of up to three years, a fine of up to $250,000, and a mandatory $100 special assessment fee for pleading guilty to 18 U.S.C. § 1512(c)(2) and (2); a term of imprisonment of up to one year, a term of supervised release of up to one year, a fine of up to $100,000, and a mandatory $25 special assessment fee for each of the Section 1752 offenses; and a term of imprisonment of up to six months, a term of probation of up to five years, a fine of up to $5,000, and a mandatory $25 special assessment fee for each of the Section 5104 offenses.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes an incorrect rendering of the applicable guidelines. First, the PSR does not include a Guidelines analysis for all Counts—Counts One through Six—to which Wood pleaded guilty. *See* PSR ¶¶ 27-47. U.S.S.G. §1B.1(a)(1)-(3) describes the steps a sentencing court must follow to determine the Guidelines range for each count, which includes determining the applicable Guidelines, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. §1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR does not follow these steps. It concludes (*see* PSR ¶ 36) that Counts One through Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

## Count One: 18 U.S.C. §§ 1512(c)(2) and 2

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[73] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[74] | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | **Total** | **27** |

## Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | | +2 |
| U.S.S.G. § 2B2.3(c) (1) | Cross-reference to U.S.S.G. § 2X1.1 U.S.S.G. § 2J2.1(a), (b) from Count One | 25 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | **Total** | **27** |

## Count Three: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact or Dangerous Weapon | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a), (b), (c) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | **Total** | **22** |

---

[73] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[74] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Wood admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

**Counts Four, Five, and Six: 40 U.S.C. §§ 5104(e)(2)(C), (D), and (G)**

Pursuant to U.S.S.G. §1B1.9, the Guidelines do not apply          N/A

**Multiple Counts**

The government agrees that all counts group under U.S.S.G. § 3D1.2 because the victim of each offense is the same: Congress. *See* U.S.S.G. § 3D1.2(a) and (b). That being so, the offense level applicable to the Group is the offense level of the count of conviction with the highest offense level. *See* U.S.S.G. § 3D1.4.

| | | |
|---|---|---|
| U.S.S.G. §3D1.1 | Combined Offense Level | 27 |

**Acceptance of Responsibility**

| | | |
|---|---|---|
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -2 |
| U.S.S.G. §3E1.1(b) | Upon Motion of the Government | -1 |

**Adjusted Offense Level**

|  | **Total** | **24** |
|---|---|---|

The PSR's second error is regarding Count One. The PSR incorrectly applies neither the eight-point enhancement for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice (U.S.S.G. §2J1.2(b)(1)(A)), nor a two-point enhancement for obstructing or impeding the administration of justice (U.S.S.G. §3C1.1).

### *Eight-Point Enhancement (U.S.S.G. §2J1.2(b)(1)(A))*

The eight-point enhancement is applicable because the defendant engaged in threatening behavior for much of the time that he was on restricted Capitol Grounds and while he was inside the Capitol.

Some examples of Wood's behavior that constitutes evidence of Wood's causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice include:

- Messages sent on January 6, 2021, to Individual 1[75] (emphasis added):

  **WOOD:** We first started off as a civic protest but **it quickly turned into chaos**. *We* **pushed up the steps, the cops were overcomed** and *we the people* **stormed the capitol** and *we* **filled the halls of Congress** and **filled Nancy's office**. Others destroyed her office and a woman *I* **pushed through a hall** with was shot and killed.

- Message sent on January 6, 2021, to Individual 2[76]:

  **Individual 2:** Are you causing trouble

  **WOOD:** I did lol

- Message sent on January 6, 2021, to Individual 3[77] (emphasis added):

  **WOOD:** It was total chaos. *We* **sent congress running** into their escape tunnels.

- Message sent on January 6, 2021, to Individual 4[78] (emphasis added):

  **WOOD:** *We* **raided the whole building** and **sent Congress running**. It initially was about Trump but it turned into a deeper cause than that. When Trump called *us* to stop, *everyone* verbally said no!

- Message sent on January 2, 2021, to Individual 7[79] (emphasis added):

  **WOOD:** I am leaving Tuesday night and will be back Wednesday evening. *I am down for whatever* **they want to do! If they want to raid Congress,** *sign me up, I'll be brave heart* **in that bitch!**

- Message sent on January 6, 2021, to Individual 8[80] (emphasis added):

  **WOOD:** *We* **just stormed** the Capitol now, *we* **are busting** into the

---

[75] Gov't Ex. 01, p. 1.

[76] *Id.* at 2.

[77] *Id.* at 3.

[78] *Id.* at 4.

[79] *Id.* at 7.

[80] *Id.* at 9.

house chambers.

**Individual 8:** They have locked it down and sent them under tunnels to another building.

**WOOD:** I know because *we* **took the bitch over**.

**Individual 8:** You on the steps yourself?

**WOOD:** No ***I'm inside*** the building *we* **busted the windows out** ans crawled through.

- Message sent on January 5 and 6, 2021, to Individual 9[81] (emphasis added):

**WOOD:** ***Should I, Matthew Mark Wood, die tomorrow*** **on January 6th** in the year of our Lord 2021, [Individual 9] shall receive my car as a gift in my death. The car is red **like the blood *I will* shed**. (January 5, 2021)

**WOOD:** ***I'm*** in the Capitol, *we* **stormed it**. ***I am fighting*** **capitol police**. Woman has been shot and killed

- Message sent on January 1, 2021, to Individual 10[82] (emphasis added):

**WOOD:** Dude, next Wednesday is going to be wild!

- Message sent on January 6, 2021, to Individual 12[83] (emphasis added):

**WOOD:** Yes, ***I broke through the window***, I lost Tyler! It's chaos [ . . . ] I'm in pain but ***I'm pushing forward***.

- Message sent on January 5, 2021, to Individual 13[84] (emphasis added):

**WOOD:** Things are about to **blow the lid** tonight and tomorrow.

**Individual 13:** You think so???

**WOOD:** Oh if we lose tonight **it definitely will be!** ***I am preparing myself*** to be there until Thursday.

---

[81] *Id*. at 10.

[82] *Id*. at 13.

[83] *Id*. at 17.

[84] *Id*. at 19.

- Message sent on January 6, 2021, to Individual 19[85] (emphasis added):

  **Individual 19:** What you done done?

  **WOOD:**     *I stormed* the Capitol. *I was* one of the *first ones* to storm inside.

- Message sent on January 6, 2021, to Individual 20[86] (emphasis added):

  **WOOD:**     [Individual 20], shots fired. In Capitol. *I'm fighting* Capitol **police**. Pray.

- Message sent on January 6, 2021, to Group 1[87] (emphasis added):

  **WOOD:**     *We* **just stormed** the Capitol, we bust the door down. I'm in here trapped. The Capitol police have us pinned. *We are* **trying to fight back**. [ . . . ] *We* **just broke through** Capitol police, *we are going to bust* into the house chambers. [ . . . ] Guns are out. [ . . . ] The police are raiding with actual guns. Alarms are blaring. [ . . . ] *We* **are trying to take the house** but they are pulling guns! I was just hit with a tear gas bomb. Shots fired!! [ . . . ] 7 agencies couldn't stop *us*, the FBI, Homeland Security, Metro Police, DC Police, Capitol Police, Secret Service, and National Guard. [ . . . ] Freedom did prevail, it prevailed them all into hiding.

This is not a situation where Wood was all talk. His actions, as shown through the media recovered from Wood's phone, through USCP surveillance video, and in publicly available open-source video, show that as soon as Wood saw the police and the people converging on the Capitol, he left behind his grandmother and his friend to make good on his promise to "sign up" and "be brave heart in that bitch!" As soon as he got on restricted grounds, Wood climbed the media tower and got a bird's eye view of the chaos. Wood saw the rioters flocking towards the Capitol, he saw the rioters surrounding police on the West Plaza, he saw the police falling back to the Lower West Terrace, and then into the Tunnel. Emboldened by seeing the progress that the rioters were making,

---

[85] *Id*. at 26.

[86] *Id*. at 27.

[87] *Id*. at 32-36.

he descended the media tower and joined those who were pushing against and attacking police officers on the NW staircase. At some point, he found a flag, and for the next nearly two hours, that flag hardly left his hand.[88]

As he stood there hanging onto the scaffolding poking out through a hole cut in the tarps covering the Inaugural scaffolding, Wood was just a few feet away from police officers who were being assaulted, beaten back, and sprayed with various chemicals of unknown origin. While this was happening, Wood was inciting others to join the violence, to move forward, and to fight. While the thousands of rioters on restricted grounds may not have been able to see the violence happening between the rioters and the police officers, they could see Wood, standing tall, waving his flag, and waving folks forward.

Once at the Northwest Plaza, he ran to the front of the rioters and was right behind the window to the north of the Senate Wing door when it was broken out. He was the tenth person through that window. He joined the group that chased the police through the halls of Congress, up to the Senate chamber itself. He was then part of the group that pushed through the Crypt, invaded the House Speaker's suite of offices, and desecrated the space and the objects therein. Importantly, Wood was also part of the group that terrorized the staffers then present in those offices, who hid for hours in fear under a table. While in there, Wood photographed sensitive and personal areas that showed signs of vandalism, entered numerous offices, rummaged through desks, drank from a glass of water he found sitting on a table next to a laptop, and filmed the screen of said laptop.

Wood then went to the Rotunda and continued to find ways to be "brave heart." There was a lot of flag waving and yelling, but he also went down through Statuary Hall to the threshold of the House Chamber and there joined with other rioters to break through the police line, fight the

---

[88] *See* Gov't Ex. 01, p. 25.

police, and attempt to bust into the House Chamber, where members were still present. The messages he was sending throughout his time in the Capitol (see above and Gov't Ex. 01), were rife with violent rhetoric and victimization of himself and the other rioters. Wood's text rhetoric was enough to incite one member of the Group 1 chat to respond, "Do I need to load up my guns and come down there[?]"[89] Wood ran back to the Rotunda at one point to encourage others to come help to bust into the House Chambers.

Wood then retreated to the Rotunda and the foyer between the Rotunda and the East Rotunda Door, nearly exits, and then heads back into the battle. It was the final push by the rioters against the police officers. Wood was there for it. He ran to the front and pushed against the police who were then attempting to push the rioters out. He fell back once, then got back into it. He waved his flag, he yelled, he beckoned others forward. Eventually Wood and others were pushed out of the Rotunda, and then again out of the Capitol. But even then, the rhetoric and incitement continued.

On January 8, 2021, Wood messaged Group 1[90] (emphasis added):

**I don't regret my actions** because they were **honest and pure actions** to send my government, Congress, a message. **We patriots fought for our country**. Few died for this cause, many injured because of it. [ . . . ] **I am proud I took a stand**. But the things I experienced is nothing to be proud about. It's complicated.

On January 12, 2021, Wood messaged Individual 13[91] (emphasis added):

Oh I know, I am aware that they are going to impeach him and they are purging all conservative followers on all social media platforms. I ain't reading it or watching it but I am staying up to date. I am afraid this country is about to pop off. **Make sure your household is ready. The gun stores are empty. Yesterday while we were there, everyone was talking about fighting their government.** At this point ANYTHING can happen. Hell the stock market is on thin ice and out of control

---

[89] Gov't Ex. 01, p. 33.

[90] *Id*. at 36.

[91] *Id*. at 20.

and investors are speculating the possibility of war... [ . . . ] They [the Democrats] think they want war. What they stand for is only worth fighting for... **what we stand for is worth dying for.**

On January 13, 2021, Wood messaged Individual 7[92]:

Wednesday was perhaps a necessary day, if not for anything, necessary for history. It must be recorded in the books that **people stood up when it's nation stood against them.** And we did. [ . . . ] Today, many cannot see its value. **Soon we all will.**

To the government's knowledge, Chief Judge Howell was the first to address a situation like this where the defendant plead absent a plea agreement in a case where there is a dispute as to the eight-point enhancement. The Chief Judge's findings and rulings found in the transcript of the Sentencing Hearing are instructive as many of the reasons why the enhancement applied to Rubenacker are similar to the reasons why it applies to Wood. *See* Transcript of Sentencing Hearing, ECF No. 70 (Howell, C.J.), *United States v. Greg Rubenacker*, 21-CR-193 (BAH).[93]

As the Chief Judge recognized in *Rubenacker*, "Expression of a threat can be physical, not verbal threats of harm." *Rubenacker*, ECF No. 70, p. 56. In support of her ruling applying the eight-point enhancement, the Chief Judge spoke of how "[t]he defendant's physical movements inside the Capitol communicated threats to law enforcement. This was not one of the rioters who, on January 6th, merely walked inside the Capitol for a few minutes or seconds and then left with no encounter or engagement with any law enforcement officers." *Id.* Neither was Wood.

As described in poignant detail above, Wood engaged in threatening conduct throughout his two-hour assault on the Capitol and those who were, unlike him, lawfully inside the building that day. The Chief Judge's analysis as to Rubenacker is relevant here. "Angry members of the mob including the defendant escalated the situation in the Rotunda. They refused to follow the

---

[92] *Id.* at 8.

[93] A copy of the *Rubenacker* sentencing transcript is attached as Gov't Ex. 05 hereto.

orders of the police, overwhelmed law enforcement, and engaged in pushing and threatening – the bottom line is: This is threatening conduct." *Rubenacker*, ECF No. 70, p. 59.

So is that the bottom line here. The defendant engaged in threatening conduct while on restricted grounds and while inside of the Capitol no January 6, 2021. The eight-point enhancement should be applied.

### *Two-Point Enhancement (U.S.S.G. §3C1.1)*

As to the two-point enhancement, the Probation Officer also incorrectly concludes that it should not be applied. The reality is that the defendant intentionally destroyed material evidence, both in the context of media on his own phone and with regards to his Facebook account.

As shown in the messages above, Wood deleted his Facebook account and other social media accounts as he became paranoid about being wanted by the FBI for his participation in the attack on the U.S. Capitol. He had his friend checking the FBI's website to see if his name was on it, he deleted his social media and encouraged others to do the same. He also deleted media from his phone that was especially incriminatory against him. For example, Image 39 (supra) was used as part of his social media posting immediately after he left the Capitol, but that image was not on his phone.

### No Dispute As To Criminal History Category (CHC)

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 50. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 24, Wood's Guidelines imprisonment range is 51-63 months' imprisonment.

### VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and

characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's

time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Before ever entering the Capitol, Wood climbed the media tower in the West Plaza. There he got a bird's eye view of what was happening. He heard the shouts of those around him. He himself was shouting. A voice that matches the defendant's voice is heard on videos filmed by the defendant saying, "This is OUR HOUSE!" and "Hold the line!" While Wood is filming while on the media tower, voices can be heard shouting, "Take it! Take it! Take it!", "Breach it! Breach it!", "Breach the building!", "Take the Capitol!", and "Break the windows! Take the Capitol! Take the Capitol!" Wood knew the rioters' intent before he descended the media tower. The videos show a group of rioters besieging the Tunnel of the Lower West Terrace. Even with this knowledge and having seen the violence already occurring between rioters and police, Wood made his way to the Capitol, and became one of the first ones in and the last ones out, spending eighty minutes inside. Wood justified his actions as the actions of others as a "necessary revolt."

Wood's statements prior to the riot demonstrate that he was prepared for violence. In telling another individual of his plans for January 6, 2021, Wood stated, "I am down for whatever they want to do! If they want to raid Congress, sign me up, I'll be brave heart in that bitch!"[94] Wood

---

[94] It is perhaps worth noting that in the 1995 film *Braveheart*, William Wallace's greatest contribution is inspiring others to fight.

made good on this statement. He truly saw his involvement in the attack on the Capitol as his and his fellow-rioters' moment to rise up and defeat their oppressors in a violent and "necessary revolt."

Wood was prepared for violence, even going so far as to predict his own death, even if in jest. Wood messaged another individual, "Should I, Matthew Mark Wood, die tomorrow on January 6th in the year of our Lord 2021, [Individual 9] shall receive my car as a gift in my death. **The car is red like the blood I will shed.**" Emphasis added.

As outlined above, Wood spent hours advancing with the mob, inciting others to join, and then once the police line was overwhelmed, moving on to the next point. As can be seen by his acts of dominance and destruction while inside the Capitol and by his resistance to leaving, Wood truly wanted to occupy the Capitol that day. He was one of the first in and one of the last out. Few people stayed longer or trespassed on more square footage of the Capitol than Wood did.

Later that same day, Wood messaged others, bragging, "We raided the whole building and sent Congress running. It initially was about Trump but it turned into a deeper cause than that. When Trump called us to stop, everyone verbally said no!" He further boasted that "7 agencies couldn't stop us, the FBI, Homeland Security, Metro Police, DC Police, Capitol Police, Secret Service, and National Guard."

Once Wood saw himself listed on the FBI's website, he took a vacation to Florida, deleted evidence from his phone, then called the FBI. While speaking with the FBI, however, Wood made up a self-serving story about being forced into the Capitol against his will and being unable to find a way out. These misrepresentations and destruction of digital evidence show that even when turning himself in, Wood was not fully accepting responsibility for his actions that day.

Wood's constant incitement of others over the course of several hours happened at many

of the locations of the worst violence and destruction, from the West Plaza to the Ohio Clock Corridor, from the House Speaker's suite of offices to the House Chamber corridors, and finally to the final stand in the Rotunda. The seriousness of this offense including the defendant's incitement of the mob violence, entry into the U.S. Capitol during the initial breach, and direct conflict with and disobedience of uniformed police officers, demands a lengthy sentence of imprisonment.

### B.  The History and Characteristics of the Defendant

Wood is a young man whose parents were high school sweethearts, was raised in a loving environment, and had no criminal history. Presently, he lives with his brother and works for a burial and casket supply company while attending college part-time. His mother described him as having "always shown respect for authority and the law." There is no excuse for Wood to have acted the way he did over the course of those hours as he and others frightened and intimidated Capitol staffers, police officers, and the nation. Not only did he leave his grandmother and friend behind, but while Wood was in the Capitol "fighting" with police, Wood's grandmother was left alone, texting Wood to, "Tell Tyler to come to tree when he gets ready to go so I won't be left.[95] This was after Wood's mother told Wood, "Please be careful don't get hurt and keep my mama safe!!!!!!"[96]

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

---

[95] Gov't Ex. 01, p. 21.

[96] *Id*. at 32.

administration of the democratic process."[97]

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Wood's criminal conduct, engaging in threatening behavior against police officers and against the Capitol and his constant incitement of others to violence, is a clear example of disrespect for the law. When Wood entered the Capitol grounds, the Capitol itself, and then as he made his way from floor-to-floor and room-to-room within the Capitol, it was abundantly clear to him that lawmakers, their staffers, and the police officers protecting them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in danger. On January 6, 2021, the rule of law was not only disrespected; it was under attack. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and threatening behavior towards police officers are not taken seriously. It could also suggest that the law favors those who have every benefit in life and yet choose a path of violence, upheaval, and chaos. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[97] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                    at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[98] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Wood also weighs heavily in favor of a lengthy term of incarceration. First, although he has a criminal history category of I, the fact that he knows the difference between right and wrong and purposefully and deliberately chose wrong weighs heavily against him. He was not caught up in the heat of the moment. He and two others drove to Washington, D.C., all the way from North Carolina prepared for violence. Through his own messages, Wood showed that he was prepared for violence, having spoken of "the blood I will spill" and being "brave heart in that bitch [the U.S. Capitol]!" The group ended up arriving so late that they missed the former President's rally. Instead of going back home, Wood left his grandmother and his friend and joined the rioters walking down Pennsylvania Avenue in their march on the Capitol. He had come to Washington, D.C., prepared to march on the Capitol, and when the opportunity presented itself, he seized it.

Once at the Capitol, he joined with those who invaded the restricted grounds, climbed the media tower, got a bird's eye view and a full perspective of what was happening, specifically that

---

[98] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

on the West Lawn, the West Plaza, and the Lower West Terrace, grossly outnumbered police officers were being viciously attacked and overrun by rioters. And then Wood went deeper. His aggression and yelling and incitement were not tempered when he saw the fear in the faces of police officers, it was enflamed. Each police line that fell invigorated him to take the next step. Wood, someone whose mother claims that he respects authority, walked brazenly and in the midst of a mob into offices occupied by the Speaker of the House chanting "Where's Nancy?" While the identity of the individuals chanting Is unclear, Wood is not dissuaded from continue his invasion of the Speaker's suite of offices. And then he stayed in the Capitol for close to another hour.

Wood's decisions were informed and a deliberate rejection of the fact that he knew better. True, he did express remorse and self-surrender, but he only did so after seeing his face on the FBI's website. As Judge Chutkan recognized,

> [The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions."

*United States v. Matthew Mazzocco*, 21-CR-54 (TSC), Tr. 10/4/2021 at 29-30. At the sentencing for Rubenacker, Chief Judge Howell stated,

> Dissatisfaction with our country's legitimate and peaceful avenues for expression of discontent [doesn't] give citizens license to disobey the law and overthrow democratically elected governments. It bears repeating, again and again, at every one of these sentencings that every legitimate and reputable review has found the 2020 presidential election to be fair, with the results unassailable. This defendant is a grown-up. He was a grown-up on January 6th, 2021; he should have known better.

*Rubenacker*, ECF No. 70, p. 153. 21-CR-193 (BAH).

This defendant's sentence must be sufficient to provide specific deterrence from committing future

crimes of rebellion and violence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider [ . . . ] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[99]

---

[99] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

The *Rubenacker* case, described above, is substantially similar to this one and provides useful point of comparison. Like Wood, Rubenacker pleaded guilty to the indictment without a plea agreement. There, the combined offense level for the five counts of conviction (violations of 18 U.S.C. §§ 111(a), 231, 1512(c)(2), 1752(a)(1) and 1752(a)(2)) was 22, yielding a Guidelines range of 41 to 51 months. Chief Judge Howell sentenced Rubenacker to 41 months' incarceration, the bottom of the Guidelines range. As with Rubenacker, a sentence within the Guidelines range would not create an unwarranted disparity.

Another comparable case is that of *United States v. Thomas Robertson*, 21-CR-34 (CRC). Robertson was an off-duty police officer who recruited his mentee/subordinate officer to go to D.C. with him. Robertson traveled to D.C. with police badges, his police department gun, and a stick. Like Wood, Robertson entered the U.S. Capitol through the Senate Wing Door without lawful authority in a sea of rioters that was engaging in destructive and violent behavior. Robertson took photos and videos of participation. Like Wood, Robertson destroyed evidence from his phone and deleted his social media account. During sentencing, the government sought the eight-point enhancement under U.S.S.G. §2J1.2(b)(1)(B) and the two-point enhancement under U.S.S.G. §3C1.1. The Court agreed that both should apply. Wood, in contrast to Robertson, stayed in the

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Capitol for a much longer time and went to many more locations within the Capitol. Wood also engaged in a much more visible and active role in inciting other rioters on restricted grounds and while inside the Capitol with his flag waving, yelling, and calling others forward.

Because of Wood's highly aggravating conduct before, during, and after the riot, and the absence of any mitigating circumstances other than, perhaps, his youth, a sentence in the middle of the applicable Guidelines range would be sufficient but no greater than necessary to satisfy the requirements of 18 U.S.C. § 3553(a).

## VII.    RESTITUTION

The parties made no agreement as to a fine since there was not plea agreement. However, consistent with other January 6 convicted felons, this Court should order Wood to pay $2,000 in restitution, which reflects in part the role Wood played in the riot on January 6.[100] If so ordered, Wood's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[100] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 57 months, which is a midrange—but within guidelines—sentence as calculated by the government, restitution of $2,000, and a total of $225 in mandatory special assessment fees.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____

Sean P. Murphy
DC Bar No. 1187821
Assistant United States Attorney
Detailee to the District of Columbia
U.S. Attorney's Office—Dist. of Puerto Rico
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-566-7878
sean.murphy@usdoj.gov

_____/s/_____

David T. Henek
Assistant United States Attorney
NY Bar No. 5109111
601 D Street, N.W.,
Washington, D.C. 20530
202-252-7566
david.t.henek@usdoj.gov