## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 22-CR-00223(APM)** |
| **MATT WOOD,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Matt Wood,  through his attorney,  Kira Anne West,[1] pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case.  After carefully reviewing the  final PSR with Mr. Wood, the defense  objects to the added paragraphs 23a and 23b. *See* ECF  No. 51, p. 8 and paragraph 39, the 3 level enhancement.[2]  These allegations by the government are addressed *infra*.  The defendant maintains that an adjusted offense level is 12 and respectfully requests a variance from the Guideline range of 10-16 months.  For the reasons set forth herein, Mr. Wood requests that this Honorable

---

[1] The Court will recall undersigned counsel took over this case after Mr. Wood's initial attorney died of Covid-19.
[2] This objection is based on the recent opinion in *US v. Seefried*,, 21-287(TMF), holding that the counting of the electoral college does not invoke the "administration of justice."

1

Court impose a sentence of a period of home confinement,[3] two years probation, 60 hours of community service and $500 restitution to account for:

1.      His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building, and his sincere remorse in this regard;

2.      His amazing commitment to breaking the cycle of poverty in his family; and

3.      His long history of a strong work ethic which has allowed him to be a productive member of society.

## I.      **Background**

Matt comes before the Court having plead guilty to the indictment in this case which, as the Court knows, is highly unusual. But never in undersigned's entire legal career has she seen the government go after a criminal defendant with such gusto and seething animosity.[4] Mr. Wood turned himself in voluntarily to the FBI[5] and signed a detailed statement of offense in which he admitted that he

---

[3] 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

[4] For a young defendant with no criminal history and one who committed no violence nor encouraged it, the government's stance is mind boggling. One would think the government's behavior would grind Matt's ambitious and patriotic spirit to dust-but not so. Mr. Wood has continued to work and volunteer just as he did before he was charged and has a very optimistic view of his future.

[5] Upon seeing his picture on an FBI most wanted list, he called the 1800 number listed and asked to turn himself in. He then gave a detailed interview to the FBI, and voluntarily gave them his phone to download.

entered the U.S. Capitol building through a broken window.[6] He walked out of the building, (he asked for help from a USCP officer on how to get out in fact), he did not cause any damage, nor did he engage in violence. He did not enter the House or Senate Room floor, nor did he engage in actively encouraging violence. That's different than his encouraging others to protest. He  voluntarily turned himself in, gave a statement to the FBI , gave them his phone and cooperated with them for 6 weeks before getting a lawyer. When this Court considers the behavior of other criminal defendants charged with crimes stemming from January 6, 2021, the Court will find that  Mr. Wood should not go to the penitentiary.

### A. **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others.   https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.  This was a lie and he refused to concede. False claims were made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned.

Amazingly, Trumps willingness to undermine confidence in the democratic process infected millions of his supporters and they were convinced that the loser

---

[6] This window was broken by a rioter minutes before Matt entered.

was actually the winner. Now we know that before the January 6th riot, Trump White House officials strategized about a plan to direct thousands of angry marchers to the Capitol Building. On the planning call were Mark Meadows, the white House chief of staff, Rudy Giuliani -Mr. Trump's personal lawyer, and Representative Jim Jordan, Republican of Ohio, among others. Now we know the "stop the steal" rally at the Ellipse to the capitol was not accidental but a well-planned scheme urging the crowd to violence.  According to Representative Liz Cheney,  Vice Chair of the House Select Committee investigating January 6, "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript.

According to a Washington Post Article from June 13, 2022, many in Trump's inner circle, including  his White House Counsel, informed Trump that there was no basis for overturning the election results but that Trump ignored those voices.  While most of these high profile lawyers and advisers to the President testified to the January 6th committee that they told the President personally the facts about the election results and their discomfort with his claims that the election had been stolen, most did not "correct the public record on the issue or speak out

against Trump's false claims." https://www.washingtonpost.com/national-security/2022/06/13/jan-6-committee-hearings-live/ When these government advisors failed to correct the narrative, it left a huge informational void that was filled with the likes of conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes. And the President himself added fuel to the fire by declaring that he was trying to actually protect the democratic process.[7] People like Matt stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021. We are actually still finding out new facts every day in these cases.

This Court can only understand why Matt came from North Carolina to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.  He brought his grandmother with him, further indication he had no plans to enter the Capitol or commit any violence. While consumption of media news is no excuse for bad behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of

---

[7] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an election when the numbers being certified are verifiably WRONG. You will see the real numbers tonight during my speech, but especially on JANUARY 6th…"
https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28, 2022).

this country, not just Mr. Wood.  The media sets the tenor for how people feel

about their rights and freedoms and can also plant notions (often false) of

discontent or even outrage.  After months of watching our major cities burn, many

people became convinced that vocal displays of outrage in the form of protesting

was the only way to make their voices heard.  Additionally, because of the

widespread belief, which turned out to be true, that very few BLM supporters were

being prosecuted for their criminal behavior while violently protesting, the media

helped reinforce the notion that there would be little to no consequences for

protestor actions. https://www.mauinews.com/opinion/columns/2021/07/heres-

why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-

protests-cover-looting-police-say/5324881002/.

Matt, like millions of other Americans, tried to make sense of the media

coverage surrounding the events of 2020 and especially the election results.  He ate

up the online and televised media coverage of these events in the Summer of 2020,

and was filled with a narrative that ANTIFA and other groups had it out for

President Trump's supporters.  Along with his family, Matt tried to determine what

was actually happening in our country and which media outlets were telling the

truth about the election.   They saw the so called "mainstream" media label

destructive and violent BLM riots as "mostly peaceful" and the protestors praised

on national media outlets for their strongly held beliefs.  And while the majority of

BLM protests in the summer of 2020 were, in fact, peaceful, a report studying

these protests found a large number of Americans believed they were not.  The

report suggested that the "disparity stems from political orientation and biased

media framing such as disproportionate coverage of violent demonstrations."

https://time.com/5886348/report-peaceful-protests/.

Matt similarly had strongly held beliefs after the Presidential election,

mostly influenced by the President's own messaging and propaganda, that there

had been irregularities in the election.  When Matt and his family turned in to

media sources they often reported totally opposite facts.  There didn't seem to be

any middle ground.   Either you were with the President or against him. There was

no apparent way to tell which side was backed with evidence and facts.  It was

widely reported, both that the election was legitimate, and that it was stolen.  When

faced with this void of reliable information, Matt, and his family chose to listen to

the President of the United States.  They based this decision on the fact that if

anyone had the best and most reliable information, it would be the Commander in

Chief.  They also trusted that he had the right kind of people surrounding him and

advising him about this topic and surely they must know more than the average

person.  All these factors were in play when Matt decided to come to D.C. to hear

the President at the rally and to *peacefully* protest the results of the election and the

lack of attention to alleged voting irregularities (emphasis added).

As we are slowly learning through the hearings that have taken place and

through other investigative reports, such as the one from the New York Times

linked herein, there were two types of protestors in the crowd on January 6th.

https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There

were ones initially who waited outside barricades and peacefully assembled with

the intent just to exercise their First Amendment rights and others there with a plan

to incite the crowd and to breach the Capitol building.  The regular folks, like Matt,

were referred to by some of the planners, including the Proud Boys, as the

"normies."  The "normies" were used as unwitting pawns in the plans of the Proud

Boys and others that day.



*Id.* The plan depended on  creating chaos and whipping up the "normies" into a

patriotic frenzy.   The groundwork for this frenzy had been laid in the weeks before

January 6th by Trump propaganda about election fraud and had been fueled by Trump himself at the rally on the mall.  The Proud Boys intended to use the large crowd to distract and overwhelm as they went to the work of breaking into the Capitol.

Matt had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine.  This 23 year old, small town, North Carolina boy with  a sincere belief in President Trump was a perfect pawn for the agitators in the crowd.[8]  Consider that it has taken the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years  of investigation, to parse through to what they believe  is some truth about what transpired that day.   How could Matt, or any "normie" that day have known what was to happen?   He came to the Capitol with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election.  He merely thought of himself as a witness to the injustice of an unfair election and wanted to show support to  President Trump at the rally.   He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothing. He did not carry anything other than a flag he found on the grounds of the Capitol.  He came with his grandmother and a friend, not as part of an

---

[8] Not surprisingly, Matt has not had the opportunity or knowledge to attend a school like Georgetown University,

organized group.  He committed no violent actions in his peaceful protest.  He did

not destroy anything. His only desire was to participate in a democratic process

that is protected under the First amendment of our Constitution. Unfortunately, he

now understands that going into the Capitol that day was not part of that legal

democratic process and he deeply regrets his actions.  He now stands before the

Court after admitting to the Court at his plea hearing that he knew going into the

Capitol that day was wrong.

II.     **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

A.  **Mr. Wood's trip to D.C. and his walk to the Capitol**

Matt  believed what he read on the internet and heard from the President

himself - that the election had been stolen.   He believed that there was wrongdoing

in the State of Georgia.  He also believed that he should show his support for the

soon to be former President by attending his rally scheduled for January 6, 2021, at

the Ellipse on the Mall.  At no time did he ever think he was going to the Capitol,

let alone inside the Capitol. Not until Trump's speech and the crowd headed

toward the Capitol,  did he have any intention of  going anywhere other than the

Ellipse area.   Matt followed the large crowd there that day with no intention of

doing anything but having his voice join those of thousands of other peaceful

protestors. Now, after seeing what really happened that day by watching film on

numerous platforms, he deeply regrets going into the Capitol.

B.   **Mr. Wood's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[9] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach was several minutes before Matt actually entered the Capitol.  Hundreds preceded him in entering.  Video shows that Matt stood on the steps outside the Capitol for many minutes as hundreds of others passed him by. He stood there waving his flag on the steps sometimes to the crowd and sometimes the opposite direction.  He was caught up in the flag waiving rather than the rush to overwhelm officers or advance to the front of the crowd.

---

[9] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.



*Figure 1*

Matt was not in this first wave of protesters to reach the building after the officers on the steps were overwhelmed and retreated. When he made his way up to the upper terrace of the west side of the Capitol, there was no fighting or police interaction to be seen. See figure 2 below.



*Figure 2*

At 2:13:04pm someone, not anyone Matt knew or saw, breached the Senate Wing Entrance window on the right hand side. Others then jumped in and broke the doors open. Matt was not near the doors or windows at that time. The picture

below shows Matt approximately at 2:13:23pm.



*Figure 3*

Eight seconds later he is closer to the entrance but still not at the window area and

not yet under the covered portico.



*Figure 4*

Many people crowded around the Senate Wing Doors during this crucial

time period.   By the time Matt reached the window area people had already started

to flood into the Capitol through the doors and the broken window.



*Figure 5*

Matt could now see the people entering freely through the doors at a rapid pace.  Matt saw others jumping through the window.  He went inside through the window because he was encouraged by those behind him.  At the time he felt pressure, whether real or imagined, that the other people in the crowd  would harass him if he hesitated or seemed scared.   He felt the peer pressure of the Trump crowd and he was not able to overcome that powerful influence in the mere seconds before he went in, not knowing the effects this small decision would make. Being so young, Matt had little experience to draw on in standing up to older more forceful individuals in the crowd.  He recalls that people were gesturing for him to move forward, and that's when he knew he needed to go or risk being pushed down.[10]

---

[10] In his interview with the FBI, Matt told them that unknown white male, approximately 6'3" tall, grabbed WOOD on both his shoulders, spun him around toward the Capitol, and said "let's go!"

Wood had been so far behind the first people in those doors that he had no idea how the door was opened or who opened it.   He had not seen the first steps taken to open the doors only that people were rushing in when he got there. Though many others were violent, breaking the windows, pushing officers, and pushing others,  Matt  was not violent.  Besides being encouraged by others, Matt wanted  to see what was happening as others rushed forward.  Knowing his family was anxiously awaiting information served as one more factor in why he went in and why he stayed in.  Once inside the Capitol, Matt was peaceful and followed the crowd.  He journeyed down hallways with crowds of people with no real purpose or intent.  He spent time taking photos and video, texted his family, and walked around waving the flag.

When trying to exit, Matt found that the doors were clogged and at times blocked with the chaos of others trying to get in which was difficult to navigate. *See* Exhibits 5A-5C.  He finally flagged down an officer and asked how to get out of the building and the officer kindly explained the building was shut down and he had to wait, keeping him in the Capitol.



*Figure 6*

While leaving the crypt, in the hall going towards the house chamber side, Matt also helped police officers who were assisting an injured female officer get through the crowd make way by yelling "make way" and waving the flag for two officers.[11]

### C. **Hindsight is 20/20.**

After hearing news reports following January 6, Matt's remorse was so overwhelming that he turned himself in to the FBI by calling the FBI tip line on January 25, 2021. *See* Exhibit 6, audio recording. Two days later, without counsel present and without the benefit of a Miranda warning, he was interviewed by the FBI. The FBI 302 described Matt's statement in their interview 302 as

---

[11] The defense has no video that shows this, but expects that like so many other cases, evidence of it may show up months down the road in another case's discovery dump. This seems to transpire with frequency. There have to be cameras in this hallway but the defense has not been given any video from this hallway.

stating "He was remorseful and responsible for his actions and did not want to add to the FBI's investigative workload by waiting to be identified."[12]  The FBI agents that wrote this report never stated that Matt was in any way insincere or lying about the facts. He never once refused to answer their questions.

Matt  has absolutely no history of political extremism.   In fact, the decision to go to the District of Columbia was last minute, and he expected to attend the rally called by the President of the United States but he overslept and missed the speech.   He had absolutely no expectation or knowledge of the consequences of others' actions that day, nor the consequences that their actions would have on his being present.  He was supporting the President in what he claimed were legitimate efforts to claim victory in the Presidential election.

He fully acknowledges that he never should have illegally entered the Capitol.  While he did not personally destroy anything, he illegally played a part in an unmanageable mob.  According to Ed Maguire, a criminologist at Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in

---

[12] In determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior <u>after</u> the initiation of the criminal  case, rather than prior to a defendant's  arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.),  sentencing level reductions for acceptance of responsibility apply to a defendant's action in pleading guilty after the initiation of the case.  U.S.S. G. § 3E1.1.   Defendants are not given a more punitive sentence under the U.S.S.G.  if they do not indicate remorse prior to filing of the initial charges.  Evidence of remorse after initiation of criminal charges  is key.  This makes sense, as it allows time for the defendant to reflect on the evidence, and his own conduct.  This encourages reflection and review, and focuses on the defendant's actions after a defendant has availed himself of his constitutional right to counsel through the initiation of the prosecution of the case.

absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators.  Benedict Carey, <u>Making Sense of the 'Mob' Mentality</u>, New York Times (Jan. 12, 2021), available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html  Matt did not commit any of those actions.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." <u>Id.</u>

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." <u>Id</u>.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." <u>Id</u>.

Unfortunately, Matt followed a large crowd  rather than leave; not knowing, how violent as a whole the mob would be independently of his own actions. Matt's goal and point of being there was to peacefully protest the "stolen" election. Others who were also part of the mob, had different and more violent plans that day of which Matt is now being associated with.

18

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[13]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).    *United*

---

[13] 1.  The nature and circumstances of the offense and the history and characteristics of the defendant;
2.  The need for the sentence imposed;
3.   The kinds of sentences available;
4.  The kinds of sentence and the sentencing range…;
5.   Any pertinent policy statements issued by the Sentencing Commission;
6.  The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.  The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

A. **Nature & circumstances of the Offense & the History and Characteristics of Mr. Wood**

First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second,  Mr. Wood did not attempt to add to the violence of the mob. For example, he didn't chant "whose house, our house" or "USA, USA" like literally thousands of other protesters.  Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. In fact, he helped law enforcement by yelling "make way" so that officers could remove a wounded female officer.

 Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for about an hour, despite trying to leave earlier.  The defense is not aware of any evidence that he entered the Senate or House Chamber.

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. His actions within the Capitol have been tracked on the CCTV footage and this footage demonstrates that while unlawfully present in the Capitol with no

excuse, he did not destroy property or commit violent acts.   And when he spoke to

police officers, it was non-confrontational, respectful and helpful.  He did not suit

up for combat.  He did not obscure his face.  He was not armed.  He did not yell at

any police officers. He wore everyday clothing.  By the time Matt arrived at the

U.S. Capitol many of the barriers that had been erected along the perimeter of the

building were no longer present. He met no resistance in his walk to and inside the

Capitol. At the time,  Matt didn't dream he'd be charged for going into the Capitol.

He spoke to the officers and  the FBI freely and voluntarily when he turned

himself in.  Without representation of counsel, he fully acknowledged  his

misconduct by answering pointed questions by multiple FBI agents  and expressed

true and full contrition for his actions.  He was relieved by the opportunity to take

responsibility for his actions after the unfortunate death of his first counsel.  He has

never violated  his conditions of release.    He did not post anything on social

media or brag to friends after January 6— in fact, he was filled with shame.  This

is what he texted to a friend the morning of January 7th:

> …I'm not okay with my actions yesterday. I took a stand yes but it was
> extremely inappropriate….it was wrong. My mental state is off the charts. I can't
> believe I participated in such chaos. What's done is done. But now I must deal with
> it. I find comfort in it because I worked to stop violent destruction of the property. I
> was merely there as a citizen making a point. I didn't assault anyone. I didn't
> participate in the breaking in. I didn't participate in the destruction of property. I
> walked into, done what I thought was my part. While most of the people in there
> were just like me, every day American citizens, there were some that disgraced our
> entrance and it associated me with them and that churns my stomach. …
> *See* ECF 51, paragraph 21 and Ex. 7.

This has obviously been a tough road for Matt.   He has a very simple life: he works hard and tries at every turn to improve himself. Since being charged with this crime, he enrolled in college. He and his family are so proud of this. He has no criminal history. He pled guilty at an early stage in the proceedings,[14] thus saving valuable judicial resources.   It is of utmost importance to Matt that this Court understand that he is incredibly remorseful for his actions on January 6, 2021.  None of his actions will be erased from the internet. It's there forever.   He has fully accepted responsibility for his bad judgement in entering the Capitol building.   He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.

 Matt does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo.  In determining what punishment is warranted, this Court should not lose sight  of the fact that he did no harm, intended no harm, and was only 23 years old when he committed the offense.  His past behavior and his post arrest behavior show that he is capable of being a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of house arrest and probation considering the 3553 factors.

---

[14] Although pretrial motions were filed, the Court didn't have to rule on any of them.

Importantly, Matt has been a very responsible employee.  He has rapidly advanced at his job, and worked many hours of overtime.  See letter from employer, Exhibit 1B.

## B. Need for the Sentence imposed

### 1.  General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra.*  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence of  home detention and probation does constitute punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. He

has been on pretrial release for over a year  with many restrictions.  The National

Institute of Justice, Department of Justice, issued a summary of the current state of

empirical research stating that "prison sentences are unlikely to deter future

crime," and "increasing the severity of punishment does little to deter crime."  U.S.

Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to*

*Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the*

*Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Matt's  likelihood of recidivism is really non-existent. He has expressed

genuine remorse and contrition.  His acceptance of responsibility was swift,

complete and without reservation.  Research has consistently shown that while the

certainty of being caught and punished has a deterrent effect, "increases in severity

of punishments do not yield significant (if any) marginal deterrent effects."

Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28

(2006)" Three National Academy of Science panels… reached that conclusion, as

has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the*

*Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence*

*Severity: An Analysis of Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Matt's  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come.[15] A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Matt urges the Court to impose a sentence of home detention in this case in light of his sincere and complete remorse,  his non-violent conduct at

---

[15] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

the Capitol, and his early and consistent acceptance of responsibility, and the lack of a need to further deter him.

### 3. Just Punishment

Particularly during this pandemic, it is best for the community, as well as for Matt, that he continue his service to the community.  He has a conviction which, in and of itself, is quite punitive.  The conviction affects possible job opportunities, and will remain with him for the rest of his life.  But home confinement and probation will allow him to continue to work, show remorse and to help support his family - both financially and emotionally.   If incarcerated, he would lose his job, and his home, while wreaking havoc on the rest his family.

Given sentences imposed in comparative cases, a sentence of home detention and probation is  unusual perhaps but not unheard of and is appropriate here.  And as we saw recently in this Court in *US v. Nicholas Rodean*, 21 CR 57 (TNM) Judge McFadden sentenced a young man (28 years old) who was found guilty after a bench trial  to 240 days home confinement rather than the 57 months the government asked for due in large part to his medical condition, Asperger's. Judge McFadden also reasoned that young Nicholas was influenced by other rioters, namely Jacob Chansley. So too with Matt.

Probation involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice. *Jones v. Cunningham,* 371 US 236, 242 (1963). Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. *Ibid.* Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. *Ibid.*

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid.* They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid.* Probation significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid.*

### C.  The kinds of sentences available

A sentence of   incarceration would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *See infra*.[16]

---

[16] This does not include every case, just a sampling.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay any significant fine.

The government asks this Court to impose two enhancements. With regard to the 2 level obstruction enhancement under USSG 3C1.1, the Court can dismiss this quickly. First, Matt did delete text messages and disconnect his social media the day after January 6, but NOT because he was charged with an offense, but because he was ashamed. The guideline requires there to be an "official investigation, meaning that charges have already been brought, a grand jury has been seated, or a criminal complaint filed."[17] Nothing Matt told the FBI was a materially false statement nor did any statement obstruct or impede any official investigation or prosecution in this case. In fact, Matt cooperated with the FBI for six weeks before he got a lawyer to represent him. He cooperated and debriefed

---

[17] The cases the government cites do not support their contention that the enhancement applies. The *Bell* case involved a "witness."  Here, the case never progressed to the point where there was need for a witness. The *Malki* case does not apply because when Matt deleted the items on his phone (which were later found by the FBI) he had no idea he would be interviewed by the FBI and he didn't delete anything after the interview. In *Malki*, a case involving treason and espionage, the Court upheld the enhancement because the defendant  was "deleting cell phone records just before he was interviewed by Government agents, deleting emails after such  interviews, falsely claiming to the District Court that he had taken documents from TQ by accident whereas he had stolen documents after leaving TQ, and representing to the Court that he had no criminal record when in fact there is a warrant outstanding in Massachusetts charging him with disorderly conduct, resisting arrest, and assaulting a police officer in 1997.The *Mills* case took place in a prison. Of course there would be an investigation. The *Ruballo* case was a money laundering/wire fraud case where the defendant was destroying evidence during the execution of a search warrant. And "only a fraction of the [deleted ] material was recovered."  833 Fed. Appx 275, 280 (11th Cir. 2020). The defendant also shredded key evidence after the defendant learned the investigation was in full swing. *Id.* None of these cases come close to the instant case.

with the FBI not once, but twice. The defense maintains that Matt was pushed by

an unknown person into the Capitol and he did try to get out. Undersigned counsel

is perplexed by the government's claim that the "FBI had to engage in countless

hours of tracing the defendant's steps outside and inside the Capitol to determine

he was not in fact pushed into the Capitol…", in other words, doing their job.  ECF

No. 51, p. 23. This makes no sense as tracking these defendants takes less than an

hour of time. The government uses facial recognition software and who knows

what else.

Likewise, the 8 level enhancement should not be applied under U.S.S.G.

2J1.2(b)(1)(B), nor the 3 level enhancement under 2J1.2(b)(2). Turning to the

statement of offense entered into by both parties at the plea hearing, there is no

mention whatsoever of any of the government's allegations and the facts haven't

changed.[18] The government's current position is surprising given the fact that they

offered Matt a plea to only the felony count with no enhancements long before

undersigned counsel became his counsel of record.[19] The evidence again is not

what the government states in their objections. First, Matt never intended nor did

he hurt anyone or cause property damage. Matt's actions are typical of a 23 year

---

[18] The Court asked AUSA Henek at the plea hearing about these enhancements and Mr. Henek replied that he was not prepared to discuss them. Unlike other criminal prosecutions, such as a drug case or a white collar fraud case, in J6 cases, the government continues their investigation AFTER the defendant has plead guilty. This is particularly unfair and egregious. Why does the government do this? Because they can.

[19] When undersigned counsel dared to question the plea deal( in part because Matt had not seen one video of January 6 prior to his agreement to plead guilty), a war between the parties ensued.

old young adult whose brain is not fully formed.[20]   Second, his text messages are

not even true. He never broke a window, he never fought with police.  The video

footage outside the Capitol clearly shows Matt waving a flag for several minutes

while standing on scaffolding. He doesn't break through the officers-some other

rioters do, and these officers stood by for 10 minutes and said and did nothing to

these protesters. *See* Ex.2A, video 0924 at 10:35. There is no evidence anywhere

that Matt chased an officer up the stair. In fact, when Matt sees police at various

areas in the capitol, he turns and walks away or is oblivious to them and caught up

in his phone.  *See* Ex. 4B 0123, Ohio clock corridor, and Ex. 4C, Rotunda South at

7:41.

Third, the description by the government from their objections to the Pre-

Sentence Report about what transpired in the Rotunda is also inaccurate. It is clear

that several in the crowd were trying to help the police find their way out.  *See* Ex.

---

[20] Critically Matt was a 23 year old high school graduate when this happened. As the Supreme Court stated in *Miller v. Alabama*,  after evaluating scientific studies regarding the development of children's brains, the Court explained the neuroscience is "increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." *Miller,* 567 U.S. 460, 472 n.5 (2012)(internal quotation marks and citation omitted).  Previously, the Court in *Graham  v. Florida,* 130 S.Ct. 2011 (2010) stated that  "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Id.*  at  2026. These cases have taught legal scholars 2 things: First, adolescents have diminished decision making capacity due to their impulsivity, proclivity for risk-taking, and deficiency in foreseeing consequences." *Graham v. Florida*, 130 S. Ct. 2011, 2026-27 (2010) (citing brain research). Second, they are vulnerable to negative external pressures from peers and family to a greater extent than adults, and thus they are less able than adults to escape their social context.  *Graham,* 130 S. Ct. at 2026; *Miller*, 132 S. Ct. at 2454.  The *Miller* Court insisted that the distinctive features of adolescence that reduce youthful culpability are not crime specific-they are as relevant to homicide as to non-homicide offenses. *Id.* at 2465.

8 at 25 seconds.  One rioter says "Just let the cops go." Another says "I want out. I can't breathe."   *Id.* There's no question that this is a violent encounter between police and *some* of the rioters. But Matt had no part in this and was himself trapped in the crowd that pushed and pulled everyone in that area. For example, when the government objects to Matt's description that he "was pushed toward the window by the crowd" he was at that time twisted around at the shoulders and told by an older man "let's go."  The pushing and chaos between the rioters was not only physical, but mental too. Also, there is no evidence that Matt called on others to "come forward and fight against police." ECF No. 51 at p. 24. Simply motioning to others does not infer that Matt wanted them to fight against police.  Critically, no other January 6th defendant or police officer has identified Matt as being violent that day.  The government's accusation of Matt's violence is a fiction made up by the government and they make these many assumptions from CCV video that unfortunately does not have any sound. To say that simply waving your arm and a flag was a call to arms is far-fetched. The defense agrees that Matt behaved immaturely on January 6th.  However, there is a big difference between infantile behavior and violent extremism.  The government does not seem to be able to differentiate between the immature and non-violent actions of a 23 year old and the violent and extreme behaviors of many others that day.

Drinking water from a glass and touching items on a desk are the kinds of immature behaviors the government makes out to be much more sinister.  There is no evidence, however, that Matt did these things with any malicious intent that day.  Furthermore, there is no evidence to support the government's claim the he stole "taking an unknown item from a security guard's desk." *Id.* [21] And while reasonable minds might argue about what happened in these videos, Matt did not affirmatively seek to injure any officers, nor were any officers injured that were close to Matt.

In *U.S .v. Seefried* 21-287(TNM) the  Court held that  these enhancements don't apply because they do not involve the "administration of justice."  *Id.* at P.3. Judge McFadden goes on to explain that Section 1503 would have been a better statute for the government to charge, and that the "certification is largely a ceremonial proceeding" *Id.* at p. 4, and therefore not an "administration of justice." The Court concludes by saying that if the commission wanted to include the words "official proceeding" in the guideline, they should have, but they did not. *Id.* at 21. Finally, the Court attaches a lengthy chart giving examples of proceedings that are

---

[21] Here, methinks that the AUSA has mixed up his movies. What Daniel Plainview is trying communicate is that he cannot be stopped, much like the Joker in the Dark Knight who kills indiscriminately and burns stacks of money. Why make this giant leap and non-sensical argument.  Mr. Wood is not making any kind of declaration by drinking the glass of water. Mr. Wood simply engaged in infantile behavior which fits his 23 year old self.

defined as the "administration of justice." The electoral college is not amongst them.[22]

As the probation officer aptly points out, Matt is engaging in a great deal of puffery in his communications that day—another sign of immaturity and youthful bravado. Much like J6 defendant Christopher Kelly whose case was dismissed by the government (also charged with a 1512 felony) who posted on Facebook that he was inside the building when he was not, Matt engaged in similar exaggerations for the benefit of his friends and family.[23]  Matt never fought with police, he never broke a window, and he never went to the House or Senate. All behavior typical of a 23 year old kid.

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than home confinement, probation, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court.  The following cases are a sampling where a class B misdemeanor was charged and pled to and resulted in little to no incarceration with facts that often were more egregious than Mr. Wood's:

---

[22] Two judges in this district have applied the specific offense characteristics in U.S.S.G. §2J1.2(b) to January 6 defendants convicted under § 1512(c)(2). *United States v. Reffitt,* 21-cr32-DLF (D.D.C. Aug. 1, 2022); *United States v. Rubenacker*, 21-cr-193-BAH (D.D.C. May 26, 2022).

[23] Mr. Kelly's case was  ultimately dismissed by the government because there was no evidence he was ever inside the building even though he repeatedly said he was. *See* 21 MJ 000128 (ZMF), ECF No.'s 14-15.

33

**\*\****United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF
Nos. 42 & 44 (sentenced to supervised release with home confinement even though
Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied
media accounts of violence were accurate, minimized the conduct of all of the
rioters, 3) called for a revolution even after the events of January 6, 4) encouraged
the rioters to be proud of their actions, and 5) minimized the impact of that day on
lawmakers and democracy. Judge Hogan imposed a probationary sentence with a
short period of home confinement for Ms. Bustle and an even shorter period of
home confinement for Mr. Bustle. The government recommended probation in this
case.

\*\**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three
months home confinement and two years' probation). According to the
government, who recommended probation with a short term of home confinement*,*
Mr. Bennett espoused conspiracy theories about the election, was an admirer,
albeit not a member of the Proud Boys, and boasted about his conduct. According
to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but
rather planned it for months. He posted numerous times about conspiracy theories
and a fraudulent election. On January 4, 2021, he posted to his Facebook page,
"You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for
my freedom!". On January 6, according to the government, Bennet began
livestreaming video to his Facebook page from outside the Capitol as early as 1:00
p.m. He was in the middle of the growing crowd on the West Front of the Capitol,
where some taunted police officers and sporadically threw objects at them. The
government alleges that someone near Bennett exhorted others to "move forward"
and that Bennett yelled at a police officer. Bennett also filmed assaults on the
police officers and continued to livestream events inside the building.[24]

 \*\**United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan ordered 30 days of
intermittent confinement as a condition of 24 months' probation.  Mr.
Weisbecker's conduct and treatment towards law enforcement was much more
severe than the instant case. He entered the Speaker's suite of offices, he posted
multiple videos and photos on Facebook and other media cites for days,  and
repeatedly berated federal border patrol officer at checkpoints multiple times. The
language is so bad it can't be repeated.

\*\*\**United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the
defendant to 36 months' probation. As the government pointed out in their
sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2)

[24] None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that
the distinctions the government draws are hard to justify.

chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr. Wood engaged in none of this conduct.

** *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.


In *United States v. Youngers*, 21 CR 640 (TFH), Judge Hogan again gave a

probationary sentence despite that defendant's conduct as outlined by the

government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer. Before leaving the area, Youngers filmed another

video celebrating the breach of the Capitol. Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.
Read more at: https://www.kansascity.com/news/politics-government/article268291057.html#storylink=cpy

Where a defendant pled to a class A misdemeanor charge:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yell "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.
**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;
**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. See ECF 17.
**United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

A current pending case, *U.S. v. John George Todd* 22-166 BAH) is  the

typical 4 misdemeanor charge case-2 class B's and 2 class A's. Mr. Todd is

reported as saying : "At one point inside the rotunda, while near a law enforcement

officer, Todd III yelled at the officer, 'I swear to God, I'll hip toss your ass into the

f------ crowd, mother ------!'" *See* Criminal complaint. ECF No. 1. He also is accused of smoking a marijuana cigarette inside the Capitol. Yet, the government does not believe that his conduct rises to the level of a felony charge. In the first 1512 case to be sentenced, Judge Moss varied down from a guideline range of 15-21 months and gave Paul Hodgkins 8 months incarceration, but Mr. Hodgkins walked onto the floor of the U.S. Senate-anathema to the Government. *See US v. Hodgkins*, 21-188 (RDM).

Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. Id., p. 9.

Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. Id., p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release.  Matt's conduct was nowhere near this.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. Id. A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) offense. This defendant was sentenced to five months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

All told, the facts of the offense conduct and characteristics of the defendants who garnered little or no incarceration  and were charged with only misdemeanors were starkly different than Mr. Wood's conduct and characteristics. His  culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  While Mr. Wood accepts  complete responsibility for his actions, he was guided and urged every step of the way by no

38

less of an authority than the former President of the United States and a majority of Republican Senators and Congressman that continued to repeat the 'Big Lie' that the election had been stolen by the Democrats.

This Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a broken window after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not. He was a follower, not a leader.* One of his texts to a friend says "*can't get out and my skin is on fire.*" (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he tried to get out of the Capitol and away from violence and chastised those that were destroying things* (See Ex-2 Ohio Clock Corridor and Exhibits 4 and 5 Rotunda Door Interior) (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *A little over an hour*; (7) the defendant's statements in person or on social media; *comparatively not a lot and only on January 6th;* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; *turned himself in, cooperated at the Capitol and after that his prior attorney;* (9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated sincere remorse.* He

immediately texted a good friend and said how much shame he felt. *See* attached letter from Mr. Wood, Exhibit 1A.   While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.   Matt is a kind, smart, young kid who made a terrible mistake on one day.   Matt is the kind of kid you'd want living next door to you.   This Court should not allow the government to engage in such posturing.   Rather, as the Court's history shows, this Court should mete out a punishment commensurate with the behavior of Mr. Wood compared to other rioters that day.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Wood respectfully moves this court to impose a sentence of  home confinement, 24 month's probation, 60 hours of community service,  and $500 restitution.   This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).   It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Wood as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."   *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By: _____/s/_____

Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 7th  day of November, 2022 a copy of same was

delivered to the parties of record, by email  pursuant to the Covid standing order

and the  rules of the Clerk of Court.

_____/S/

Kira Anne West

41